MINPECO, S.A., Plaintiff,

v.

CONTICOMMODITY SERVICES, INC., ContiCapital Management, Inc., ContiCapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilian Financial, Acli International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Faisal Bin Abdullah, Merrill, Lynch, Pierce, Fenner & Smith, Inc., Bache Halsey Stuart Shields, Inc., E.F. Hutton & Company, Inc., Commodity Exchange, Inc., and The Board of Trade of the City of Chicago, Defendants.

No. 81 Civ. 7619(MEL).

United States District Court, S.D. New York.

Nov. 24, 1982.

---

See also, D.C., 552 F.Supp. 327.

⚷ 9

Cole & Corette, P.C., Washington, D.C., for plaintiff; Theodore Sonde, John E. Corette, III, D. McCarty Thornton, Deborah M. House, Susan Bierman, Washington, D.C., Grand & Ostrow, New York City, Paul R. Grand, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant E.F. Hutton & Co., Inc.; Thomas Curnin, Thomas J. Kavaler, Alan B. Loughnan, Ruth D. MacNaughton, Edward R. Wiest, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Conti-Commodity Services, Inc., ContiCapital Management, Inc., ContiCapital, Ltd. and Norton Waltuch; Richard Rosen, Mark H. Alcott, Diane Englander, Peter W. Schneider, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Bache Halsey Stuart Shields, Inc.; Richard H. Klapper, Marvin Schwartz, Nadine Strossen, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant Mahmoud Fustok; Eliot Lauer, Herbert Stoller, Lorraine C. Parker, New York City, of counsel.

Arnold & Porter, Washington, D.C., for defendant Banque Populaire Suisse; Alex Bennett, Washington, D.C., of counsel.

Townley & Updike, New York City, Kirkland & Ellis, Chicago, Ill., for defendant The Chicago Bd. of Trade; James K. Leader, James E. Tyrell, Holly S. Stein, New York City, and John Stassen, John E. Angle, Frederick L. White, Scott E. Early, T. Webster Brenner, Chicago, Ill., of counsel.

Rogers & Wells, New York City, for defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., ACLI Intern. Commodity Services, Inc.; Guy C. Quinlan, William R. Glendon, Susan A. Garcia, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, Shank, Irwin, Contant, Williamson & Grevelle, Dallas, Tex., for defendants Nelson Bunker Hunt, William Herbert Hunt and Lamar Hunt, Powell Pierpoint, George A. Davidson, Susan L. Thorner, Margaret G. King, New York City, and Roger Goldburg, Dallas, Tex., of counsel.

Baer, Marks & Upham, New York City, for defendant Commodity Exchange, Inc.; Barry Mandel, Mark A. Buckstein, Stephen F. Selig, Eugene R. Scheiman, Thomas E. Albright, William A. Brandt, Jr., Joshua B. Parker, New York City, of counsel.

Perito, Duerk, Carlson & Pinco, P.C., Washington, D.C., for defendant Intern. Metals Inv. Co., Ltd.; Paul L. Perito, John P. Wintrol, Washington, D.C., of counsel.

LASKER, District Judge.

Between the summer of 1979 and early 1980, the price of silver futures rose dramatically from approximately $9 an ounce to $50 an ounce. The situation was unprecedented, creating enormous profits for some and enormous losses for others. Investigations into the causes of the price increase have been made by committees of both the Senate and the House of Representatives[1] and further inquiries by various federal agencies are reported to be in process. Minpeco S.A. ("Minpeco"), a silver trader wholly-owned by the government of Peru, alleges that it held a "short" position in silver futures during the relevant periods, and that it lost over $80 million as a result of the price increases. The thrust of Minpeco's complaint is that certain defendants conspired to monopolize the silver market, and that, in doing so, they artificially boosted the price of silver to an unprecedented and artificially high level. In addition, Minpeco charges that its brokers deceived it by urging it to "sell short" while knowing that such a trading plan was "misleading and detrimental" to it. (Complaint ¶¶ 84, 93). Minpeco also asserts that the commodity exchanges violated their statutory and common law duties to prevent market manipulation. The defendants move to dismiss the Eighth Claim of the complaint, which alleges that the defendants defrauded Minpeco under the common law of New York.

The gist of the fraud claim is as follows. At the inducement of its brokers, Minpeco entered into futures contracts for short sales of silver. A short sale is an agreement by someone who does not own—i.e. is short—a commodity to sell it at a certain time and a specified price. Such a contract is normally entered into by a trader who

---

1. *See Hearings on S.2704 Before the Senate Committee on Banking, Housing and Urban Affairs, 96th Cong., 2d Sess. (1980); Hearings Before the Subcommittee on Conservation and Credit of The House Committee on Agriculture, 96th Cong., 2d Sess. (1980).*

anticipates that the market price will be *below* the contract price at the time specified for closing the sale.

Minpeco alleges that it understood at the time it entered into the contracts that the price of silver was "artificially" high, that is, that it was higher than justified by world demand for the commodity, and that it entered into the sales believing that prices should decrease. What Minpeco did *not* know, it alleges, is that the increase in price was not merely the result of other traders' overestimation of world demands, but was, rather, the consequence of a conspiracy between defendants to monopolize the silver market. The argument continues that due to the conspiracy to monopolize, the price of silver did not drop, as Minpeco alleges it would otherwise have done, but persisted in its steady climb, with the result that Minpeco was required to "cover" its short positions at a loss of over $80 million.

Minpeco contends that it believed that the various defendants who were buying silver during the relevant periods were buying as individuals, not as members of an organized group. Had it known of the agreement to monopolize the market, it would not have entered into the short sale contracts.

First we consider the motions of the various "trading" defendants, those defendants who are alleged to have been part of the conspiracy to monopolize;[2] second, the motions of Minpeco's brokers, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("M/L") and E.F. Hutton & Co. Inc. ("Hutton"); and third, the motions of the Commodity Exchange, Inc. and the Board of Trade of the City of Chicago ("the exchanges").

## I. The Trading Defendants

Whether the complaint states a claim under the New York common law of fraud is, of course, a question of state law. However, research of the New York cases leads to the conclusion that none is closely on point. It becomes necessary, therefore, to predict what the ruling of the New York courts would be if they were confronted with the question. The task of prediction, perilous in the most favorable of circumstances, is compounded in this case by the fact that the law of fraud is, and has been for a considerable period, in a state of flux.

Minpeco has not alleged that the defendants made any affirmative misrepresentations. The defendants argue that under New York law, mere silence does not constitute fraud in the absence of a fiduciary duty or a confidential relationship between themselves and plaintiff. Moreover, they contend positively that the relationship between parties on opposite sides of a market is not a fiduciary or confidential relationship.

Defendants' analysis of New York case law appears to be correct, as far as it goes. *See, e.g., Perin v. Mardine Realty Co., Inc.,* 5 A.D.2d 685, 685, 168 N.Y.S.2d 647, 648 (2d Dept. 1957) (When parties deal "at arm's length," seller is under no duty to speak, and his "mere silence" does not constitute fraud.), *aff'd,* 6 N.Y.2d 920, 190 N.Y.S.2d 995, 161 N.E.2d 210 (1959); *Noved Realty Corp. v. A.A.P. Co., Inc.,* 250 A.D. 1, 5, 293 N.Y.S. 336, 341 (1st Dept. 1937) (relation of buyer and seller is not affected by any fiduciary relations).

Relying in part on its interpretation of the common law of fraud, the United States Supreme Court reached the same conclusion as to the federal securities laws. In *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the Court held that a buyer of shares has no duty to disclose nonpublic information to the sellers, unless there is a confidential or fiduciary relationship between the buyer and the sellers:

"No duty could arise from [Chiarella's] relationship with the sellers of the target

---

**2.** ContiCommodity Services, Inc., ContiCapital Management, Inc., ContiCapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilian Financial, ACLI International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Faisal Bin Abdullah, and Bache Halsey Stuart Shields, Inc.

company's securities ... He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence."

445 U.S. at 232, 100 S.Ct. at 1116.

■ Thus, defendants are correct that the law did not impose upon them a duty to speak merely because they were on the opposite side of the market from plaintiff. However, even between parties who do not have a fiduciary or other confidential relationship, a duty to speak does arise where defendants have engaged in "some act or conduct which deceived plaintiffs." *Moser v. Spizzirro,* 31 A.D.2d 537, 295 N.Y.S.2d 188, 189 (2d Dept. 1968), *aff'd* 25 N.Y.2d 941, 305 N.Y.S.2d 153, 252 N.E.2d 632 (1969). *Accord: Perin v. Mardine Realty, supra,* 5 A.D.2d at 685, 168 N.Y.S.2d at 648. Defendants' response that they did not *say* anything false is therefore insufficient: conduct, even without speech, may be "tantamount to a false representation." *D'Alessandra v. Manufacturers Cas. Ins. Co.,* 106 N.Y.S.2d 561, 564, 567 (Sup.Ct. Kings Co. 1951) (Bartels, J.). *See Noved Realty Corp., supra,* 250 A.D. at 6, 293 N.Y.S.2d at 341:

" 'The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment of material facts not equally within the knowledge or reach of plaintiff.' "

*quoting Stewart v. Wyoming Cattle Ranche Co.,* 128 U.S. 383, 9 S.Ct. 101, 32 L.Ed. 439 (1888). *See also Ziring v. Corrugated Container Corp.,* 183 Misc. 600, 604, 49 N.Y.S.2d 686, 691 (Sup.Ct. Kings Co. 1944):

"Actual or positive fraud includes cases of the intentional and successful employ-

ment of any cunning, deception, or artifice, used to circumvent, cheat, or deceive another."

The question, then, is whether, measured by these criteria, the alleged actions of the defendants amounted to fraudulent conduct. One pertinent New York decision is *Donovan v. Aeolian Co.,* 270 N.Y. 267, 200 N.E. 815 (1936).[3] In *Donovan,* the plaintiff brought an action in fraud, alleging that she had purchased a piano from the showroom of a manufacturer believing it to be new, and had later discovered that it was used. It was conceded that no representations had been made to plaintiff as to the piano's age. However, the court concluded that the manufacturer, in putting a piano for sale in its showroom, "induced" in plaintiff the belief that the piano was new. Having, through its conduct, created a mistaken belief as to a material fact, the manufacturer was under a duty to speak to correct the mistaken impression.

"Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent. In this case it is clear that the defendant's salesman was under a duty to inform the plaintiff that the piano ... was not a new piano."

270 N.Y. at 271–72, 200 N.E. 815.

Whether conduct was fraudulent was also at issue in *Willcox v. Harriman Securities Corp.,* 10 F.Supp. 532 (S.D.N.Y.1933) (Patterson, J.), a suit alleging common law fraud in the securities market which appears to be the closest case on its facts to the instant action.[4]

The *Harriman* plaintiffs alleged that they had acquired stock in the Harriman Bank at a time when the bank

"maintained a fictitious and artificial market in Harriman Bank stock at prices

---

**3.** *Donovan,* although an old case, is by no means forgotten. It has been cited several times in recent years, including by the late Judge Gurfein in *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 283 (2d Cir. 1975) and by Justice Lawrence Cooke, writing for the Third Department, in *Warren Brothers Co. v. New York State Thruway Authority,* 34 A.D.2d 97, 309 N.Y.S.2d 450 (3d Dept. 1970),

*aff'd* 34 N.Y.2d 770, 358 N.Y.S.2d 139, 314 N.E.2d 878 (1974).

**4.** It is not surprising that there appears to have been very little development of the application of the common law to the securities markets since the passage of the Securities Exchange Act in 1934.

in excess of its true value, for the purpose of misleading the plaintiffs and others into believing that the artificial market quotations represented the real value of the stock."

*Id.* at 534. Judge Patterson concluded that the creation of an "artificial market" was fraud, even where the defendants had made no affirmative representations:

"If persons boost the quoted price of a stock above its real value by fictitious sales in order to induce the public to take over their stock at the artificial levels, one who acquires stock for value from the manipulators may treat the transaction as infected by fraud and rescind. The fact that information as to the sales at artificial figures comes to the victims by reports or quotations published in the newspapers rather than by direct communications from the manipulators does not break the chain of causation. That is the very medium of information contemplated and intended by the operators of the plan."

*Id.* at 535.

Judge Woolsey reached a similar conclusion in *United States v. Brown,* 5 F.Supp. 81, 93 (S.D.N.Y.1933), *aff'd on other grounds,* 79 F.2d 321 (2d Cir.), *cert. denied sub nom McCarthy v. United States,* 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462 (1935), a criminal action for mail fraud. The defendants in *Brown* were charged with creating an "artificial market" for the shares of their company and having advertised the shares by the use of false statements. Judge Woolsey held that the creation of the artificial price alone constituted grounds for finding fraud:

"It is obvious that, when two or more persons, by a joint effort, raise the price of a listed stock artificially, they are creating a kind of price mirage which may lure an outsider into the market to his damage. In my opinion, such a procedure would of itself constitute a fraud on the public."

5 F.Supp. at 93.

▬ We conclude that the alleged conspiracy of defendants resulted in the equiv-

alent of the type of "price mirage" described by Judge Woolsey. Defendants are not alleged merely to have remained silent. To the contrary, it is charged that they acted, and that their actions, in creating an artificial price, "lure[d plaintiff] into the market to [its] damage." *Id.*

In response to this argument, defendants contend that:

"the cases cited by Minpeco rest on the distinction between an *artificial* price set by a *manipulated* demand, and *genuine* price set by *genuine* demand."

(Defendants' Reply Memorandum at 9). We disagree. Minpeco has alleged that the rise in silver prices was the result of a conspiracy to monopolize the silver market, in violation of, *inter alia,* the antitrust laws. Such a price increase, if proven, in our view would not represent *genuine* demand; that is, it would not reflect increased desire of buyers for the product—to the contrary, it would result from the alleged monopolistic manipulation of the market. It would, if proven, be as artificial, and as fraudulent, as the "pools" and "wash sales" condemned by Judges Woolsey and Patterson.

In determining that the New York courts would consider defendants' alleged actions to be fraudulent, we also take note of the increasing tendency of many courts to impose a duty to speak even in circumstances which, in an earlier time, might have been regarded as "mere silence of the seller, without some act or conduct which deceived." *Perin v. Mardine Realty, supra. See,* for example, *Gaines Service Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 432 N.Y.S.2d 760 (N.Y. City Civ.Ct. 1980), *aff'd* 113 Misc.2d 752, 453 N.Y.S.2d 391 (Sup.Ct., App. Term 1981):

"[We] decline to endorse the 'dubious business ethics of bargaining transactions with which deceit was at first concerned.' ... It is no longer acceptable, if ever it was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when ... he 'would reasonably expect a disclosure.' "

105 Misc.2d at 697, 432 N.Y.S.2d at 762–63, quoting W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) § 106 at 696 and Restatement (Second) of Torts, § 551(2)(e) (1977).

Justice Blackmun also noted this trend in his *Chiarella* dissent, in which, in addition to disagreeing with the holding of the case, he wrote:

> "Even at common law, ... there has been a trend away from strict adherence to the harsh maxim *caveat emptor* and toward a more flexible, less formalistic understanding of the duty to disclose. *See, e.g.,* Keeton, *Fraud—Concealment and Non-Disclosure,* 15 Texas L.Rev. 1, 31 (1936). Steps have been taken toward application of the 'special facts' doctrine in a broader array of contexts where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."

445 U.S. at 248, 100 S.Ct. at 1124.

In the latest edition of his treatise, Professor Prosser also notes the trend toward imposition of liability for fraud where the defendant's conduct has been fundamentally unfair. W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) § 106. Prosser explains that the "older cases" applied the rule that "there can be no liability for nonfeasance, or merely doing nothing" and that "occasional modern cases" continue to follow that rule. *Id.* at 696. However,

> "[T]here has been a rather amorphous tendency on the part of most courts to find a duty of disclosure in cases where the defendant has special knowledge, not open to plaintiff, and is aware that the plaintiff is acting under a misapprehension as to facts which would be of importance to him, and would probably affect his decision.... This has now generally been extended to any facts or conditions basic to the transaction.... *The law appears to be working toward the ultimate conclusion that full disclosure of all*

material facts must be made whenever elementary fair conduct demands it."

*Id.* at 698. (Emphasis added).

Defendants contend, however, that even assuming *arguendo* their actions were fraudulent, Minpeco did not rely on those actions in making its investment decisions. The short answer is that Minpeco alleges that it did rely (Complaint ¶ 121), and the plaintiff's allegation must be accepted as true for the purposes of Rule 12(b)(6).

Accordingly, we conclude that Minpeco has alleged that the conduct of the trading defendants "exceeded the bounds which separate shrewd trading from the domain of fraud," *Noved Realty, supra,* 250 A.D. at 6, 263 N.Y.S. at 341, and the motion of the trading defendants to dismiss the claim for common law fraud is denied.

*Rule 9(b)*

Defendants are correct, however, in their contention that the complaint fails fully to comply with the requirements of Fed.R. Civ.Pr. 9(b). Rule 9(b) requires a plaintiff to give every defendant notice as to the specific wrongs with which that defendant has been charged. *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1197 (S.D.N.Y.1982). The existing complaint fails to do so.

Minpeco attempts to avoid the strictures of Rule 9(b) by identifying the defendants at the beginning of the complaint as members of various "groups," i.e., the "Hunt group," the "Conti group," etc. After establishing the various "groups," the remainder of the complaint, with a few exceptions, makes reference only to the activities of the "groups," not to the activities of the individual defendants. If Minpeco means to allege that, within the "groups," the activities of the individual defendants were identical, then it should set forth such allegations specifically.[5] If, on the other hand, Minpeco does not have a good faith basis for alleging that the defendants acted monolithically, then each defendant is entitled

---

**5.** For example, there is nothing objectionable about an allegation such as that made in ¶ 47, which simply lists a number of the individual

defendants and states that they met in Europe between May and October, 1979 to "coordinate their activities in the silver market."

to notice in the pleadings as to its alleged role in the fraud.[6]

■ Minpeco's contention that it cannot be expected to plead "matters particularly within the opposing party's knowledge" is an inadequate response. It is not being asked to do so. Minpeco chose to name each of the defendants *as* defendants. It must have had a good faith basis for its charges. Fed.R.Civ.Pr. 11. Each defendant is entitled to notice in the pleadings as to the factual basis for the charge against him or it, and, "as to allegations which must be made on information and belief due to [plaintiff's] lack of actual knowledge, a statement of the facts upon which the belief is based." *O'Connor, supra,* 529 F.Supp. at 1197.

Accordingly, Minpeco is required to amend its complaint to set forth the role played by each defendant in the allegedly fraudulent conduct. In addition, Minpeco must specify in greater detail how the defendants' acts caused its injuries and how and to what extent it relied on the defendants' allegedly fraudulent conduct.

The motion of the trading defendants to dismiss the common law fraud claim is denied on the condition that plaintiff amend its complaint within thirty days in accordance with the ruling above.

## II. *The Brokers*

Minpeco's fraud claim against its brokers, which the brokers move to dismiss, is of a substantially different nature than the claim against the trading defendants. Minpeco alleges that in early 1979, M/L and Hutton began to solicit Minpeco to engage them as its brokers. In the course of the solicitation,

> "Hutton lavishly entertained plaintiff's employees as a means of further showing plaintiff Hutton's knowledge, experience and sophistication in the commodity futures trading world; and Hutton's agents and representatives introduced plaintiff's

employees to members of the COMEX and CBOT, other traders and other futures dealers."

(Complaint ¶ 80). Minpeco yielded to the brokers' inducements and employed them, paying them "substantial fees" for their services. (Complaint ¶¶ 81, 90).

Having retained Minpeco's account, the brokers:

> "induced Minpeco to adopt a trading plan and strategy of engaging in large volumes of short sales in silver futures. Relying on [the brokers'] representations, this plan and strategy was adopted by Minpeco."

(Complaint ¶¶ 83, 92). Unfortunately, for Minpeco, the trading plan was "misleading and detrimental" to Minpeco, which the brokers knew well, because they had been "participating in the transactions and activities heretofore described ... with the intent and effect of raising the price of silver." (Complaint ¶¶ 84, 93). Minpeco's losses, like its fees, were substantial: it alleges a $51,000,000 loss on the trades made through Hutton, (Complaint ¶ 87) and a $31,000,000 loss on the trades made through M/L (Complaint ¶ 96).

■ Minpeco has alleged the elements of fraud: representations by the defendants, known by them to be misleading, which induced plaintiff to rely, causing plaintiff damages.

However, the claims against the brokers also suffer from a lack of the requisite specificity with respect to the alleged representations by the brokers. At oral argument, counsel for Minpeco stated that it "could put in detailed statements as to when and where we were induced by M/L and Hutton." (Transcript of Oral Argument of October 8, 1982, at 55). While it is not necessary for a complaint to contain a detailed description of every conversation alleged to have been misleading (Minpeco asserts that it received "almost daily trad-

---

**6.** "Group pleading" also gives rise to somewhat aimless disputes such as that between ACLI and Minpeco over whether ACLI should be part of the "Conti group" or part of the "broker group." In any event, ACLI, like any defendant, will be liable or not based on its own conduct, regardless of how it is categorized by plaintiff.

ing advice" from M/L and Hutton)[7] defendants are correct that Rule 9(b) requires the plaintiff to plead the gist of the allegedly deceptive communications, and a general description of when and where the communications took place, sufficient to afford defendants "a reasonable opportunity to answer the complaint and . . . adequate information to frame a response." *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir. 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

### III. *The Exchange Defendants.*

The complaint against the exchanges alleges that they "negligently or willfully or in bad faith, failed to carry out their duties so as to further the conspiracy set forth above." (Complaint ¶ 39). In particular, Minpeco alleges that the exchanges "increased maximum permissible limits for daily price fluctuations," (Complaint ¶ 56), and that they failed to take "any action to control the rapidly rising silver prices, even though they each knew or should have known that this fluctuation in price was being caused by the large silver acquisitions in the market and the market manipulation by the Hunts, Conti and Brokers," (Complaint ¶ 61).

■ The nature of the claim is difficult to discern. If Minpeco means to allege only that the exchanges, with knowledge of the other defendants' conspiracy, failed to act, then the complaint fails to allege fraud. No case has been cited, nor has any come to our attention, in which a defendant has been held liable for fraud simply for his failure, without fraudulent intent, to prevent a third party from defrauding the plaintiff.

On the other hand, if Minpeco means to allege that the exchanges failed to carry out their duties and intended that failure to facilitate the fraudulent scheme of the other defendants, that would constitute fraud: it would amount to an allegation that the exchanges were participants in the fraudulent conduct.

As it stands, the complaint fails to allege fraudulent intent on the part of the exchanges, and must be dismissed on that basis. However, the dismissal is without prejudice to amendment if the plaintiff can *in good faith* allege that the exchanges' failure to act was intended for the purpose of assisting the other defendants in their fraud.

### Conclusion

The motion of the Commodity Exchange, Inc. and the Board of Trade of the City of Chicago to dismiss the Eighth Claim for common law fraud is granted without prejudice. The motions of the remaining defendants to dismiss the Eighth Claim are denied on condition that plaintiff amend its complaint within thirty days to meet the requirements of Rule 9(b) Fed.R.Civ.Pr. in accordance with this opinion.

It is so ordered.

---

**7.** This contention, which is made in Minpeco's Memorandum of Law at 62, does not appear in the pleadings.