Ralph A. **HEINEMAN**, Plaintiff,

v.

**S & S MACHINERY CORP.** et alia, **Defendants.**

No. CV–86–3841.

United States District Court, E.D. New York.

Oct. 23, 1990.

---

Brown & Wood, New York City, for plaintiff.

Fabricant Yeskoo & Colangelo, New York City, for defendant Amro.

Moses & Singer, New York City, for defendants S & S Machinery, Amro, Edelstaal, Srybnik and Waller.

SIFTON, District Judge.

Plaintiff, Ralph Heineman, brought this action against individual and corporate defendants, seeking damages for federal securities and common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of plaintiff's employment contract, and a derivative action for waste of corporate assets. Jurisdiction was predicated on the federal law claims and diversity of citizenship. By decisions issued on May 26, 1988, and August 17, 1988, this Court dismissed (1) plaintiff's RICO claims as time-barred, (2) the derivative claim, and (3) seven 'defendants for failure to allege any wrongdoing by them.

■ Following a hearing in February 1990, this Court reserved decision on defendants' motion to dismiss the federal securities claim as time-barred under the New York borrowing statute. That motion is now granted based on the conclusions of law set forth in this Court's opinion dated February 6, 1989, and the factual finding, made on the evidence introduced at the hearing, that plaintiff was not at the time the action accrued or thereafter a resident of New York State. While plaintiff's lease on his apartment on Third Avenue in Manhattan had not expired at the time of the events in question, he quite clearly no longer regarded the place as his residence. The lease was not renounced simply in order to accommodate a close friend who coincidently needed a place to stay when plaintiff determined to move to New Jersey. Plaintiff's limited use of the apartment as a *pied à terre* on the few occasions he chose to stay overnight in the City does not persuade me that he regarded the place as a residence. He did not use the apartment as a place to live in any full sense of the term as, for example, a home to which to invite friends or in which to read the Sunday papers, work or watch TV. The principal use to which the apartment was put was to sleep in it on occasion. The other activities of life for which a residence are generally used were performed in New Jersey. The listing of New York as plaintiff's residence on tax returns and legal documents signed by plaintiff in the face of this pattern of activity simply persuades me that plaintiff either did not understand or misused the term "residence" in these papers.

This matter is also before the Court on the motions for summary judgment of the remaining defendants, S & S Machinery Corp. ("S & S"), Amro Industries, Inc. ("Amro"), American Edelstaal ("Edelstaal"), Simon Srybnik, and Saul Waller, to dismiss the common law fraud and contract claims.

The following facts, except where otherwise noted, are not in dispute. Until 1981, Heineman owned all of the twenty outstanding shares of American Edelstaal, a machine tool importer and manufacturer and acted as its president and chief executive officer. In 1977, Edelstaal entered into contracts with Masinexportimport ("Masin"), a Romanian state-owned company, to sell Masin's lathes and drills in the United States. Edelstaal acquired exclusive distributorship agreements for certain Romanian SNA and DLZ lathes, and DC industrial drills. However, these contracts provided that, if Edelstaal did not sell a sufficient volume of products, the contracts would become non-exclusive. By 1980, Masin's machines accounted for 80% of Edelstaal's business, while the remaining 20% consisted of sales of lathes manufactured by Edelstaal itself.

Plaintiff claims that defendant S & S Machinery Co. had for some time been interested in establishing a business relationship with the Romanians. According to plaintiff, after S & S and its principals failed to establish their own relationship with the Romanians, they determined to acquire Edelstaal's rights to the exclusive distributorships by whatever means were

necessary and ultimately resorted to widespread deception and fraud to achieve these ends.

During the time in question, S & S was the largest United States importer and distributor of machine tools and was primarily controlled by Simon Srybnik and his two brothers. In 1977 or 1978, S & S began discussions with the Romanian government to import and distribute Romanian machinery in the United States. In November 1979, Srybnik and the Romanians agreed to form Amro Industries under a joint venture agreement for the purpose of selling Romanian machine tools and other industrial products to North America. While the agreement respected current distributorship contracts, it provided that, if the distribution rights held by another distributor were terminated, the rights in that line would automatically revert to Amro. Heineman claims that he knew little about these negotiations.

In 1979, at the same time he was negotiating with the Romanians, Srybnik also initiated negotiations with Heineman and proposed that he and Heineman form a new, jointly owned company. Under this proposal, which was never agreed to, American Edelstaal would continue to manufacture and sell its Machinex lathe and any other domestic machines but would assign its exclusive rights to Romanian machines to the new company.

Meanwhile, as part of a Protocol signed on October 11, 1989, S & S and Masin agreed to prices and delivery dates for a number of Romanian lathes and other machine tools. Under this Protocol, S & S ordered several machines covered by Edelstaal's agreements. However, on January 10, 1980, Masin cabled S & S that certain orders could not be filled because Edelstaal had just informed them that no agreement between Edelstaal and S & S had been reached. Plaintiff also claims that other documents indicate that Srybnik again attempted to circumvent Edelstaal's exclusive contracts by ordering machines under the pretext that they were to be distributed in countries other than the United States. Thus, in January and February 1980, S & S ordered large quantities of Romanian machines for distribution in Argentina or other countries in Latin America, where plaintiff claims it had no established dealer network.

S & S resumed negotiations with Heineman in August 1980 with the view of acquiring a controlling interest in Edelstaal. According to Heineman, Srybnik and other representatives of S & S promised Heineman that, in exchange for an 80% interest in Edelstaal, S & S would contribute $100,000 in capital to the company, obtain additional letters of credit for Edelstaal, and provide it with additional lines of machine tools to sell. They also represented that Heineman would remain Edelstaal's president, that Edelstaal would maintain its own identity, that defendants would guarantee 80% of Edelstaal's existing indebtedness, that Edelstaal would be built into a company with $10 million in sales, and that Edelstaal's securities would be sold to the public.

On January 26, 1981, Heineman and Amro entered into a written agreement pursuant to which Edelstaal sold Amro one hundred twenty shares of its unissued stock for $100,000 and Heineman purchased ten shares in exchange for which he transferred his rights in the Edelstaal trademark to Edelstaal and capitalized a $160,000 loan previously made by him to the company. On the same day, Heineman entered into a five-year employment contract with Edelstaal pursuant to which he was to remain its president.

Heineman alleges that, subsequent to entering into the agreement, defendants diverted and appropriated Edelstaal's assets and business into companies which they controlled, including S & S and Amro; sabotaged Edelstaal's relationship with its bank and the Romanians; failed to provide additional capital, lines of credit, and new machinery; and ultimately forced him to resign his position as president of the company. Plaintiff asserts that defendants' conduct with respect to their specific promises constitutes fraudulent misrepresentation and breach of contract. Plaintiff additionally claims that defendants' failure to

reveal their true intentions of undermining his company and appropriating its exclusive Romanian distributorships states a claim for fraudulent non-disclosure.

## DISCUSSION

Summary judgment may be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any disputed material facts, *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983), and the Court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Beacon Enterprise, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*)). To defeat a motion for summary judgment, however, the opposing party may not rest upon the conclusory allegations or denials set forth in the pleadings but must set forth specific facts showing that there is no genuine issue for trial. Rule 56(e); *Schering, supra,* 712 F.2d at 9. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

The Supreme Court has instructed that "[i]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. Under New York law, a plaintiff is required to prove a fraud claim through "clear and convincing evidence." *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir.1983); *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 718–19 (1978). Thus, there is no genuine issue of material fact if the evidence presented by plaintiff is insufficient to allow a rational finder of fact to find fraud by clear and convincing evidence. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. However, this Court's cognizance of plaintiff's higher evidentiary burden does not alter the rule that the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513.

### The Fraud, Claims

Under New York law a person who induces another to enter into a contract by misrepresenting a material fact or making a promise that he has no intention of keeping may be held liable for damages in fraud. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1043 (2d Cir.1986). In order to establish a claim of fraud, each of plaintiff's claims must satisfy the following elements: that (1) a representation was made, (2) to a material fact, (3) which was false when made and (4) known by the maker at the time to be false, (5) which was made with a present intent to deceive and induce reliance by plaintiff and (6) upon which the plaintiff did justifiably rely (7) without notice of its falseness (8) to his injury. *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987).

Plaintiff must further demonstrate that the promises were made to him with a present intent not to perform the promised acts. "Under New York Law, a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made." *Murray,* 811 F.2d at 121; *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (4th Dep't 1978). "Fraudulent intent is not demonstrated by evidence of mere non-performance of a promise," *Murray,* 811 F.2d at 122, while evidence that efforts were made to carry out the alleged promise can effectively negate, as a matter of law, any inference of fraud. *Paretti v. Cavalier Label Co., Inc.*, 702 F.Supp. 81, 84 (S.D.N.Y.1988). Finally, plaintiff's allegations of fraud cannot be based upon a statement of future intentions, promises or expectations which were speculative or an expression of hope at the time when made. *Roney v. Janis*, 77 A.D.2d 555, 430 N.Y.S.2d 333, 335 (1st Dep't 1980).

Defendants assert that, even if all of Heineman's deposition testimony is accepted as true, his own testimony negates the possibility of prevailing on each of his claims of misrepresentation. Defendants first claim that plaintiff's own testimony establishes that, subsequent to the execution of the January 26, 1981 agreement, defendants acted in a manner consistent with the alleged misrepresentations and/or plaintiff failed to perform a condition precedent to the promised conduct. Defendants further argue that the alleged representations were too vague and ephemeral for plaintiff to have justifiably relied on them.

Defendants' assertions must be rejected. Although plaintiff's claims as to a number of the alleged misrepresentations appear tenuous at best, plaintiff has raised serious questions as to whether defendants misrepresented their intentions with regard to the guarantee of Edelstaal's debts and the provision of additional lines of credit. Moreover, the evidence on these issues provides a substantial basis for plaintiff's claim that defendants fraudulently failed to disclose their intent to subvert Edelstaal as an independent entity and appropriate its Romanian business.

*The Promise of Additional Lines of Credit*

■ The second amended complaint alleges that during the period of August 1989 through January 26, 1981, defendants Simon Srybnik and Saul Waller represented to Heineman that additional lines of credit needed to expand Edelstaal's purchasing capacity would be made available to the company. During his deposition, plaintiff reiterated that as part of of the January 1981 contract Waller and Srybnik had agreed to provide additional credit after Edelstaal exhausted the credit line from its own bank, First National State Bank of New Jersey ("FNSB").[1]

The record indicates that, rather than assisting Edelstaal in securing further credit, defendants' actions served to under-

mine the company's existing financial arrangements. Thus, an internal bank report dated September 1981 stated that Edelstaal's credit line "had lapsed in May and was not renewed at that time because of the sale of 80% of the company by Mr. Heineman to AMRO Industries, a subsidiary of S & S Machinery." At the time of sale, FNSB requested financial statements from both Amro and S & S, as well as an assurance of continuing guarantees and a signed statement forbidding removal of assets in other than normal inventory sales. However, the memo reported that "S & S Machinery has been reluctant in the past to furnish statements, resulting in our reluctance to continue the line."

Another FNSB memo dated October 14, 1981, reported a deteriorating relationship between the bank and Edelstaal, largely due to the continuing refusal of S & S to provide financial information or guarantees. The memo noted that the bank had refused to renew Edelstaal's credit line "because 1) the new owners refused to give us financials, 2) the supplier question was not settled, and 3) the new owners were reluctant to give us any information on any of their businesses, although bank checkings revealed them to be substantial." The memo further noted that, as a result of the bank's refusal to renew Edelstaal's credit line, the company's outstanding receivables had fallen dramatically. As further evidence that defendants deliberately sabotaged Edelstaal's relationship with its bank, plaintiff submitted a transcript of a June 22, 1982 phone conversation between himself and Waller in which Waller reported that he had "just roughed up" a FNSB official, who had asked him for financial information.

Defendants assert that plaintiff cannot establish fraud on this claim because (1) plaintiff did not carry out the condition precedent of utilizing the credit available to him at FNSB before seeking credit from S & S and (2) plaintiff admitted that defendants did provide credit with respect to the

---

**1.** As plaintiff explained, the agreement was that "we should utilize our existing line with First National State Bank and that, as new additional

credits would be required, one or more of the S & S banks would be used [to purchase equipment]."

importation of $800,000 in Romanian machines. On the basis of the current record, defendants have not established either contention. First, it is not clear whether Heineman unilaterally began reducing his debt at the bank or was forced to by his bank. Moreover, there is considerable evidence that defendants undermined Edelstaal's credit line by their unexplained refusal to provide the bank with financial information, thus making any effort by Heineman to obtain more credit from the bank futile. Defendants have also not established, for purposes of summary judgment, that the credit arrangement for importing Romanian machines satisfied their promise of additional capital.

*Non-disclosure of Amro's Assets*

■ The second amended complaint alleges that, shortly before the execution of the January 26, 1981 stock purchase agreement, Heineman learned for the first time that Amro, and not S & S, would purchase 80% of Edelstaal's stock. ¶ 55. Furthermore, defendants Srybnik and Waller insisted that S & S's subsidiary, Amro, purchase Heineman's stock in Edelstaal and that Amro guarantee and indemnify Edelstaal and Heineman for 80% of any indebtedness to First National on certain letters of credit then outstanding. ¶ 56. The complaint further alleges that, when Srybnik disclosed that Amro would purchase Heineman's stock in Edelstaal, he intentionally failed to disclose that Amro had insubstantial assets and that the S & S Group did not intend to give it any further assets. ¶ 57.

Plaintiff has raised at least a material issue of fact with respect to the above claims. Heineman testified at his deposition that central to his willingness to enter the stock sale was defendants' guarantee of up to 80% of his company's indebtedness to the bank. According to plaintiff, he had originally requested a personal guarantee from Srybnik but was advised that he would obtain a guarantee from one of the S & S companies. According to Heineman's affidavit, it was only in late December 1980 that Srybnik told Heineman that Amro, and not S & S, would be purchasing a majority interest in Edelstaal.[2] Plaintiff conceded that he agreed to an arrangement whereby Amro would purchase his stock and guarantee 80% of his bank debt[3] without asking for financial information about Amro and without independently verifying its assets. In his affidavit, plaintiff states that he had not heard of Amro prior to December but that Srybnik and Waller assured him that it was owned by C.A.M., which was part of the S & S group. The affidavit further states that, while Srybnik refused to give a personal guarantee on Edelstaal's bank debt, both Srybnik and Waller assured him that Amro's guarantee would be sufficient.[4]

Waller and other defendants have conceded that at the time of the agreement Amro's net worth was $10,000 in cash. Moreover, Amro had no inventory at the time and had engaged in no sales activity during the prior year. While Heineman did not inquire into Amro's financial status, defendants concede that they never informed Heineman that Amro had virtually no assets and thus could not fulfill its obligation under the guarantee. However, it is defendants' contention that in an arms-length negotiated transaction such as this,

2. However, in his deposition, Heineman indicated that he was never told which of the Srybnik companies would purchase his shares until December.

3. As part of the January 1981 agreement, Amro agreed to guarantee 80% of Heineman's existing obligations (the guarantee ran personally to Heineman and not to its lender), and Amro subsequently executed a guarantee in favor of FNSB.

4. As evidence of this sort of assurance, plaintiff has submitted the transcript of a December 5, 1980 phone conversation between Heineman and Waller, which was mostly devoted to discussing the terms of the proposed merger (but which made no reference to Amro or guarantees). In the middle of this conversation, Waller mentioned a cutback in GE orders and then stated:

> "Well, it's not a problem, Ralph, let me tell you. We got loads of money here.... Sometimes you get into a situation where there's—it's like an endless pit. You go into situations where they're supposed to get better.... That's about the way it is. But you, let me tell you something. They're a strong machinery family here. They're solid! ... You never have to worry."

defendants had no affirmative duty to disclose such facts. Defendants further argue that plaintiff cannot base a fraud claim on his own failure to make simple inquiry as to information that would have been provided if requested and which was readily available.

"A common law claim for a breach of the duty to disclose facts and circumstance relevant to business contract negotiations may arise when there is a fiduciary relationship between the parties, *see Coface v. Optique du Monde, Ltd,* 521 F.Supp. 500, 504 (S.D.N.Y.1980), or when defendant possesses superior knowledge, not readily available to the plaintiff, and knows that plaintiff is acting under a mistaken belief with respect to a material fact." *Beneficial Commercial Corp. v. Murray Glick Datsun,* 601 F.Supp. 770, 773 (S.D.N.Y. 1985); *see Grumman Allied Indus. Inc. v. Rohr Indust, Inc.,* 748 F.2d 729, 738 (2d Cir.1984). The New York courts have exhibited a growing trend toward imposing a duty of disclosure in the latter instance where the lack of a fiduciary relationship is no longer considered a justification for silence. Thus, in *Gaines Service Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 432 N.Y.S.2d 760, 762–63 (N.Y.Civ.Ct. 1980), *aff'd,* 113 Misc.2d 752, 453 N.Y.S.2d 391 (N.Y.App. Term 1981), the court stated:

> "[we] decline to endorse the 'dubious business ethics of bargaining transactions with which deceit was first concerned.' ... It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when ... he 'would reasonably expect a disclosure.' "

*See also Minpeco v. Conticommodity Services, Inc.,* 552 F.Supp. 332, 337 (S.D.N.Y. 1982); W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) § 106, at 698 ("The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it.").

Defendants' assertions that they had no fiduciary relationship with plaintiff or that they said nothing false with respect to Amro are therefore not persuasive: "Conduct, even without speech, may be 'tantamount to a false representation.' " *Minpeco, supra,* 552 F.Supp. at 336 (quoting *D'Alessandra v. Manufacturers Cas. Ins. Co.,* 106 N.Y.S.2d 561, 564 (N.Y.Sup.Ct. 1951)). The Restatement (Second) of Torts § 529 provides that a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."[5] As the New York Court of Appeals explained in *Donovan v. Aeolian Co.,* 270 N.Y. 267, 271–72, 200 N.E. 815 (1936), "[w]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent." *See also Gerstle v. Gamble–Skogmo, Inc.,* 298 F.Supp. 66, 95 (E.D.N.Y. 1969), *modified,* 478 F.2d 1281 (2d Cir.1973) ("[A] half truth is often more misleading than a statement that is wholly false.").

In the instant case, it is undisputed that Heineman specifically sought and obtained a guarantee from defendant Simon Srybnik that one of his companies would guarantee 80% of plaintiff's debt. Whether or not Srybnik or other defendants specifically assured Heineman that the signing company, Amro, had sufficient resources, this representation appears implicit in both the guarantee and the fact that the S & S network of companies obviously had large resources. Thus, even if defendants did not actively misrepresent the financial resources of Amro, they owed a duty of disclosure under the law set forth above.

Case law holding that fraud cannot be based on a failure to make simple inquiries, *see, e.g., Klamberg v. Roth,* 473 F.Supp. 544, 552 (S.D.N.Y.1979), is not inconsistent with this conclusion. These decisions have

---

5. As the notes to the Restatement explain, a "statement containing a half-truth may be as misleading as a statement wholly false. Thus, a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."

addressed disputes involving land or publicly traded companies, where the information not disclosed could have been easily obtained through "duly diligent inquiry," *Roth,* 473 F.Supp. at 552, or "by the exercise of ordinary intelligence." *Kurz v. Nicolo,* 125 A.D.2d 993, 510 N.Y.S.2d 390, 391 (4th Dep't 1986). Here, the complex network of privately owned companies and joint ventures associated with S & S appears to have rendered the independent verification of Amro's actual financial status difficult, if not impossible.

*Non-disclosure of Defendants' Intent*

■ This Court also concludes that plaintiff has raised a material issue of fact with respect to his claim that defendants fraudulently failed to disclose their intent to subvert his company and appropriate its Romanian business relationship. Scienter, or an intent to deceive or defraud, may be proven by circumstantial as well as direct evidence, *SEC v. Cable/Tel Corp.,* 532 F.Supp. 873 (S.D.N.Y.1982), particularly since "circumstantial evidence may often be the principal, if not the only, means of proving bad faith." *McLean v. Alexander,* 599 F.2d 1190, 1198 (3rd Cir.1979). In a claim based on promissory fraud, the promissor's actions after making the representation may be used to establish his fraudulent intent. *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561 (S.D.N.Y.1983).

While the record indicates that both Heineman and defendants subsequently experienced considerable problems with the Romanian machines, there is sufficient evidence that, during the period preceding the merger agreement, defendants expressed considerable interest in expanding their relationship with the Romanians and that this was an important factor in their interest in acquiring majority ownership of Edelstaal. More important, defendants' conduct with respect to dealings with Edelstaal's bank

and the Amro guarantee permits a reasonable inference that defendants were not negotiating in good faith and entered into the agreement with the intent to undermine and exploit, rather than expand, plaintiff's business. Given that defendants' future plans for the new joint enterprise figured prominently in plaintiff's decision to enter the January 1981 agreement, defendants' failure to reveal their true intentions would be "tantamount to a false representation." *Minpeco, supra,* 552 F.Supp. at 336. Defendants' silence on such a central issue, if proven at trial, would accordingly constitute fraudulent nondisclosure of a material fact.

Again, defendants' assertion that they owed no duty of disclosure to Heineman must fail. Where, as here, the parties were negotiating an ongoing business relationship in which plaintiff retained a substantial financial stake as well as significant liabilities, defendants' failure to disclose their true purpose in consummating the sale agreement and their true plans for American Edelstaal would clearly be fraud. Defendants' reliance on *General Time Corp. v. Talley Inds., Inc.,* 403 F.2d 159 (2d Cir.), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), and *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), two cases addressing the duty of a purchaser of stock to disclose information under section 10(b) of the Securities Exchange Act of 1934, is not persuasive. As noted above, New York common law, which governs this claim, now imposes a stricter standard of disclosure.[6]

*Breach of Contract Claims*

■ As part of the overall package agreed to on January 21, 1981, Heineman signed an employment contract with American Edelstaal. That agreement provided that Edelstaal would employ Heineman as

---

**6.** Defendants further assert that the fraud claims must be dismissed as to S & S because there is no evidence that defendants ever represented that S & S would buy the Edelstaal shares or that any fraudulent representations were made by S & S. Although plaintiff at one point conceded that he had no understanding until the last minute of which company would buy his 80% interest, it is undisputed that Si-

mon Srybnik made the majority of the alleged misrepresentations with respect to the January 26, 1981 agreement and that during this time he was a corporate officer of S & S. There is thus at least a genuine issue of material fact as to whether Srybnik made misrepresentations on behalf of S & S for which that company would be liable.

president and CEO for a term of five years and that he would exercise all powers normally accorded to the president of a corporation. Heineman resigned his position at Edelstaal in October 1982. He claims that he was forced out by defendants who had taken control of Edelstaal's daily activities, ceased communicating with him, and refused to pay his salary.

In support of his claims, plaintiff points to evidence that, shortly after the purchase of Edelstaal, Srybnik expressed his plans to close Edelstaal's Tenafly office and that only weeks after the transaction Saul Waller began eliminating his authority as president. Plaintiff further points to the fact that between March and June 1981 Heineman's independent check-writing authority was reduced from $10,000 to $2,500, while in September 1982 it was eliminated altogether. Defendants respond that Heineman himself signed the reduced authorizations and that they were a helpful control at a time of economic stress at Edelstaal. Defendants claim that Heineman voluntarily resigned because he did not want to work in Brooklyn, where the company was relocating. Moreover, defendants assert that plaintiff's check-writing authority and salary were not eliminated until he first breached the employment contract by refusing to come to the Brooklyn office to discharge his responsibilities.

Although plaintiff's deposition testimony is contradictory as to why he resigned as president of Edelstaal in October 1982, he has raised a genuine issue of fact as to whether defendants first reduced his authority and check-writing power and whether these actions combined with defendants' conduct with respect to plaintiff's deteriorating credit situation constitute constructive discharge. "Constructive discharge occurs when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Less v. Nestle Co., Inc.*, 705 F.Supp. 110, 114 (W.D.N.Y.1988) (quoting *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir.1975)). Given the evidence that working conditions must have been so difficult or unpleasant that a reasonable person in plaintiff's position would have felt compelled to resign, *id.*, plaintiff should be permitted to pursue this claim at trial.

■ Defendants also claim that on independent legal grounds the breach of contract claim must be dismissed as against all the defendants except American Edelstaal because Edelstaal was the only entity that undertook any obligations to plaintiff under the employment contract.[7] "Before a defendant may be held liable for breach of contract, it must be demonstrated that he was a party thereto. Clearly a breach can only occur when one is under an obligation to perform in the first instance." *Stratton Group v. Sprayregen*, 458 F.Supp. 1216, 1218. (S.D.N.Y.1978). Plaintiff responds that there is sufficient evidence to "pierce the corporate veil" surrounding Edelstaal and Amro, thereby rendering the other defendants potentially liable for breach of the employment contract.

"Where the corporate form is disregarded by the owners and managers, or where owners or managers participate directly in tortious or fraudulent conduct, corporate status [is no] shield against individual liability." *Armada Supply, Inc. v. S/T Agios Nickolas*, 613 F.Supp. 1459, 1471 (S.D.N.Y.1985). In determining whether to pierce the corporate veil, New York courts accordingly examine whether there has been (1) the absence of corporate formalities, (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetration of fraud by means of the corporate vehicle. *Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.*, 599 F.Supp. 940, 943 (S.D.N.Y.1984); *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984).

As defendants correctly assert, stock control, interlocking directors, and officers are not sufficient to pierce the corporate

---

7. The employment contract was signed twice by Ralph Heineman, once on his behalf and once on behalf of Edelstaal. The contract was also "approved" by Amro, as attested by the signature of Saul Waller.

veil in the absence of evidence that a subsidiary was dominated and controlled by its parent corporation. *See, e.g., Musman v. Modern Deb, Inc.,* 50 A.D.2d 761, 377 N.Y. S.2d 17 (1st Dep't 1975). However, defendants' attempts to draw a line between Edelstaal, the signing corporation, and Amro, the new 80% owner which "approved" the employment contract, are not persuasive. As this Court has already noted, plaintiff has raised sufficient questions over whether defendants employed their majority ownership of Edelstaal and control of its finances to dominate the company and use the corporate vehicle to perpetuate a fraud. The fact that plaintiff was president and 20% owner of the very company whose veil he seeks to pierce is not dispositive given the evidence that Heineman lost control of his former company.

Defendants' attempts to erect another barrier between Amro and the other defendants must also be rejected. Given the evidence that Amro was clearly undercapitalized, had no independent business function, and was run by Simon Srybnik and S & S and not by independent officers or directors, Amro appears to represent the classic "shell" corporation. Moreover, defendants have admitted that the Srybnik brothers controlled, through direct or indirect ownership, the activities of S & S, Amro, and C.A.M. Machinery Corp., while there is considerable evidence that Simon Srybnik and his business associates employed and controlled an array of interlocking partnerships and corporations with little regard for corporate formalities.

Finally, defendants assert that Saul Waller, who they claim is simply an "accountant" and not an owner or "principal," cannot be liable on the contract claim. This claim is somewhat disingenuous given Waller's status as a director and the secretary/treasurer of American Edelstaal, as well as his position as a treasurer or secretary/treasurer of S & S and several other S & S corporations. The general rule is that a director or officer of a corporation is not liable for breach of contract "merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." *Courageous Syndicate v. People-to-People,* 141 A.D.2d 599, 529 N.Y. S.2d 520, 521 (2d Dep't 1988). However, where a corporate officer is charged with independent torts or predatory acts or where the complaint charges that he personally profited from his acts, the officer may be liable on the contract claim. *Id.; see also Armada, supra,* 613 F.Supp. at 1472. Because Saul Waller has been charged and implicated in several instances of potential misrepresentation, including the promise of additional credit and the Amro guarantee, he is therefore potentially liable under both the fraud and breach of contract claims.

For the foregoing reasons, defendants' motions for summary judgment are denied.

SO ORDERED.