Mohammed **FEZZANI**, Cirenaca Foundation, Dr. Victoria Blank, Lester Blank, James and Jane Bailey, Baydel Ltd., Margaret and Patrick Burgess, Bootlesville Trust and Adam Cung, Plaintiffs,

v.

**BEAR, STEARNS & COMPANY, INC.,** Bear Stearns Securities Corp., Richard Harriton, Andrew Bressman, Arthur Bressman, Richard Acosta, Glenn O'Hare, Joseph Scanni, Brett Hirsch, Garvey Fox, Matthew Hirsch, Richard Simone, Charles Plaia, John Mcandris, Jack Wolynez, Robert Gilbert, First Hanover Securities, Inc., Banque Audi Suisse Geneve, Fozie Farkash, Rawairaes, Basil Shablaq, Ken Stokes, Issac R. Dweck, Individually and as custodian for Nathan Dweck, Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, Millo Dweck, Beatrice Dweck, Richard Dweck, Jack Dweck, Issac B. Dweck, Hank Dweck, Morris Wolfson, Arielle Wolfson, Aaron Wolfson, Abraham Wolfson, Tovie Wolfson, Anderer Associates, Boston

Partners, Wolfson Equities, Turner Scharer, Chana Sasha Foundation, United Congregation Mesarah, Fahnestock & Co., Inc., Donald & Co., Barry Gesser, Michael Ryder and Apollo Equities, Defendants.

No. 99 Civ.0793 RCC.

United States District Court,
S.D. New York.

April 6, 2004.

Max Folkenflik, Folkenflik & McGertity, New York City, for Plaintiffs.

Richard Acosta, Raybrook, NY, Pro se.

David L. Wales, Howard Wilson, Rosenman & Colin, L.L.P., John Edward Tardera, Winston & Strawn LLP, Stuart L. Melnick, Stuart L. Melnick, LLC, John Edward Tardera, Winston & Strawn LLP, Marc J. Ross, Sichenzia, Ross & Friedman & Ference, L.L.P., New York City, for Defendants.

### Memorandum Opinion & Order

CASEY, District Judge.

This action was brought on February 2, 1999 by eleven investors (collectively, "Plaintiffs") against more than fifty individual and corporate defendants (collectively, "Defendants") arising out of the activities of A.R. Baron & Co. ("Baron"), a New York securities broker-dealer. The complaint alleges claims for federal securities fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), aiding and abetting breach of state-law fiduciary duties, and common-law fraud. Now before the Court are seven motions to dismiss the complaint. As detailed below, the motions are **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

### A. Baron's History

Baron was a broker-dealer which operated from 1992 until 1996.[1] (Compl.¶ 1.)

---

1. The facts recounted here are taken from the complaint and must be assumed to be true for the purposes of these motions. *See Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001).

During that period, Baron and its employees engaged in a widespread fraudulent scheme to manipulate the price of certain securities. The majority of Baron's business consisted of underwriting securities for initial public offerings. (*Id.* ¶ 5.) Baron brokers used cold calling to sell as much stock as possible in the companies. Because there was no true public market for the stocks, they were able to control both purchases and sales. (*Id.* ¶ 7.)

Baron first sought to increase sales by disseminating favorable information about the stocks while suppressing adverse information, as well as inventing favorable information. (*Id.* ¶ 8.) In addition, Baron made unauthorized purchases on behalf of customers. (*Id.*) When customers complained about the purchases, Baron transferred the securities to an "error account," effectively making Baron the purchaser of those securities and depleting its capital. (*Id.* ¶ 18.) Alternatively, Baron would re-bill the unauthorized trade to a different customer's account. (*Id.* ¶ 21.) Baron also engaged in "parking" stock. (*Id.*) "Parking" is defined in the complaint as executing trades to a buyer, actually a coconspirator, by which the stock would be placed in the coconspirator's account while Baron maintained the risk of loss. The transactions would be reported to create a false appearance of trading in certain securities, thereby increasing the securities' price and inducing customers to execute transactions. (*Id.* ¶¶ 120–23.)

These acts of manipulation were intended to inflate the market price of the securities that Baron was selling and convince customers to purchase those stocks. Baron and its coconspirators then sold the shares they held before the stock price crashed. (*Id.* ¶¶ 10–11.) As stated above, however, Baron's practices caused its capital to decrease, placing it in constant danger of dipping below the minimum capital level required by regulations. (*Id.* ¶ 23.)

The National Association of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC") investigated Baron on a number of occasions, imposing large fines and temporarily suspending some of its brokers. (*Id.* ¶ 94.) By the end of 1995, Baron had a net capital deficiency of $1,110,675; customer complaints amounted to $80 million. (*Id.* ¶ 247.) Baron temporarily went out of business in October 1995, as it had previously done in 1993. (*Id.*) The company finally filed for bankruptcy in July 1996. (*Id.*)

The complaint alleges that Baron's activities cost investors in excess of $80 million and inflated the market value of the securities that Baron manipulated by billions of dollars. (*Id.* ¶ 24.) Baron's activities generated litigation, both civil and criminal, in more than one federal district court, the bankruptcy courts, New York state supreme court, and before arbitral tribunals. In 1994, a federal civil suit was filed against Baron; the NASD initiated another investigation; and an arbitration proceeding was commenced seeking over $1 million in damages. (*Id.* ¶ 116.) By the end of 1994, the numerous litigation actions sought over $10 million in damages. (*Id.*) In 1995, an investor brought another suit in federal court against Baron and some of its brokers seeking $1 million in compensatory and $5 million in punitive damages. (*Id.* ¶ 212.) On December 19, 1995, the State of Alabama procured an order to show cause why Baron's broker license should not be suspended for failure to report claims and proceedings against it. (*Id.* ¶ 231.)

Baron's woes did not end with its 1996 bankruptcy. In March 1997, the NASD filed a complaint against eighteen Baron representatives. (*Id.* ¶ 269.) Then, on May 13, 1997, Baron and its employees were indicted by a grand jury in New York Supreme Court, New York County. (*Id.*

¶ 270.) All of the defendants in that criminal case either pled guilty or were convicted of charges of, among other things, enterprise corruption, the state-law analogue to RICO. (*Id.* ¶¶ 271–72.)

## B. The Manipulated Securities

The claims here arise out of public offerings of stock in the following companies: Cryomedical Sciences, Inc. ("CMSI"), Health Professionals, Inc. ("HPI"), Cypros, Innovir, Voxel, Cardiac Sciences, Inc. ("Cardiac"), PaperClip, Mammo, Symbollon, Aqua, Laser Video, and Jockey Club. Both CMSI and HPI were cofounded by Jeffery Weissman, who, along with Andrew Bressman, founded Baron. (*Id.* ¶ 64.) The complaint alleges that Weissman engaged in manipulation of CMSI and HPI stock prices before he and Bressman established Baron. (*Id.* ¶¶ 68–69.) After Baron's conception, its brokers began using the boiler room tactics described above to inflate the price of CMSI and HPI. (*Id.* ¶ 90.)

In mid–1992, Baron acted as underwriter for Cypros, a bio-pharmaceutical company without any marketable products. (*Id.* ¶ 91.) Baron placed 20% of the initial public offering with itself and its coconspirators, in violation of NASD regulations. (*Id.* ¶ 92.) Baron also executed a large amount of purchase orders for customers who never agreed to buy Cypros shares. (*Id.* ¶ 93.) The NASD later sanctioned Baron for the unauthorized trading in Cypros, and suspended Baron's top executives for sixty days. (*Id.* ¶ 155.)

Baron allegedly profited from the manipulation of CMSI, HPI, and Cypros stock prices. However, Baron ran into some difficulty when HPI lost its allure as an attractive investment. The SEC began an investigation of HPI in 1993, and newspaper articles appeared that accused HPI of fraud. (*Id.* ¶ 100.) Baron had misrepresented to customers that Hoffman–La-Roche was offering to purchase HPI, and that HPI rejected the offer because of the company's high value. (*Id.* ¶ 99.) Baron's involvement with HPI was publicized in *Barron's Magazine*, a widely read Wall Street publication. (*Id.* ¶¶ 101, 152.) The article caused HPI stock to drop in value, causing Baron to attempt to resuscitate the price through purchasing approximately 780,000 shares, then transferring the shares to unknowing customers or parking the shares with coconspirators. (*Id.* ¶ 104.) The manipulation financially strained Baron, causing its net capital to fall below the level required by the NASD and resulting in a short suspension from full trading activities. (*Id.* ¶ 107.)

Baron returned to its fraudulent activities with the initial public offering of Innovir, a biomedical company with no revenue and high debts. (*Id.* ¶ 109.) Baron instituted the same manipulation techniques it had used with the other securities. In 1994, a new group of brokers joined Baron and began manipulating certain securities: Mammo, Symbollon, Aqua, and Laser Video. (*Id.* ¶ 113.) These brokers made misrepresentations to Baron customers such as telling one of the plaintiffs here that Mammo's technologies and equipment were being installed and tested at Sloan Kettering Institute. (*Id.* ¶ 115.) The price of Innovir rose from $2½ per share to $4 15/16 per share; soon after Baron's bankruptcy, the price returned to $2 per share and is now virtually nothing. (*Id.* ¶ 245.)

Voxel was another company whose initial offering Baron underwrote. (*Id.* ¶ 118.) Baron hid or deceptively explained Voxel's lack of revenue, high debts, and short-term cash needs. (*Id.* ¶ 119.) Baron's brokers used high-pressure sales tactics and unauthorized purchases to inflate the price of Voxel shares as well. Shares of Voxel common stock went from $1 7/8 per share

to $8 3/16 per share, until Baron's bankruptcy when the price collapsed. (*Id.* ¶ 244.)

The complaint describes the sale of Mammo shares as one of the most blatant of Baron's fraudulent enterprises. According to the complaint, the market for Mammo shares consisted entirely of Baron and its affiliates. (*Id.* ¶ 175.) When the price of Mammo dropped 40%, Baron created fictitious sales of 300,000 to 400,000 shares, including unauthorized customer trades. (*Id.*) Two such trades in 1995 involved the accounts of Diaward Steel Works Ltd. and José Mugrabi, neither of whom are plaintiffs in this suit. (*Id.* ¶¶ 185–94.) In October 1995, Diaward sued Baron for fraud. (*Id.* ¶ 212.)

Also in 1995, Baron underwrote an initial public offering of PaperClip, obtaining subscriptions in excess of the maximum offering amount provided for by the terms of the initial offering. (*Id.* ¶ 196.) Baron used the investments beyond the maximum offering amount to support the other securities it was manipulating. (*Id.* ¶ 196.) Baron then used a "bait and switch" technique to procure investments from customers, ostensibly for the PaperClip stock, that would be used to fund other trades. (*Id.* ¶ 198.) Baron inflated the price of PaperClip stock from $2.00 to a high of $11 3/8 per share. (*Id.* ¶ 243.)

Finally, Baron entered into a scheme in 1995 to purchase large quantities of stock in Jockey Club at inflated prices and then resell those shares to Baron customers. (*Id.* ¶ 233.) The Jockey Club shares were, in reality, worth very little. (*Id.* ¶ 234.) Baron either persuaded its customers to purchase the securities through misrepresentations and omissions, or made unauthorized trades in customer accounts. (*Id.* ¶¶ 238–40.)

### C. Parties to this Action

Baron's widespread fraud is not contested. Baron is no longer in business; its principals are currently incarcerated. Baron and some of its senior executives are shielded from suit by bankruptcy proceedings. At issue here, however, is Defendants' liability for defrauding Plaintiffs, who were all Baron customers.

#### 1. Plaintiffs

Plaintiffs all allege that they were defrauded into purchasing stocks whose price was a result of Baron's manipulation. They further claim that Defendants here are liable for their losses. To the extent relevant, the Court discusses the Plaintiffs' individual allegations below.

#### 2. Defendants

To simplify the discussion, the Court has adopted the complaint's grouping of Defendants. While Baron and some of its top executives are not named in this suit, many of its employees are. Andrew Bressman, Arthur Bressman, Richard Acosta, Glenn O'Hare, Joseph Scanni, Brett Hirsch, Garvey Fox, Matthew Hirsch, Richard Simone, Charles Plaia, Mark Goldman, John McAndris, Jack Wolynez, and Robert Gilbert are collectively labeled as the "Baron Defendants." Andrew Bressman was Baron's President and Chief Executive Officer; he pled guilty in state court to enterprise corruption and grand larceny. (*Id.* ¶ 27, 45.) Arthur Bressman is his father, and steered prospective initial public offerings and other deals to Baron, as well as advised his son. (*Id.*) All of the other Baron Defendants were Baron brokers who have since been convicted of state crimes. (*Id.*) Of all the Baron Defendants, only Acosta has appeared in this case.

Bear, Stearns & Co., Bear Stearns Securities Corp., and Richard Harriton are de-

scribed herein as the "Bear Stearns Defendants." Bear, Stearns Securities Corp., a subsidiary of Bear, Stearns & Co. (together referred to as "Bear Stearns") acted as Baron's clearing house from April 1992 through approximately February 1993, and from July 1995 through July 1996. (*Id.* ¶ 28.) Harriton was, at the time of the complaint, a senior director of Bear Stearns Securities Corp. and its head of clearing operations. (*Id.* ¶ 50.) As a clearing house, Bear Stearns processed transfers of securities and transaction payments; it was Bear Stearns responsibility to ensure that trades made through Baron were completed on the settlement date so that the securities were delivered to the customer and cash paid to the seller. (*Id.* ¶ 79.) If a buyer or seller defaulted, Bear Stearns, as clearing house, had to pay the cash or deliver the promised securities; it then had to seek restitution from the defaulting party. (*Id.*)

The complaint alleges that the Bear Stearns Defendants knew of Baron's fraudulent activities, provided financial support to Baron, and directed Baron at times to sell the manipulated securities to the public. (*Id.* ¶ 29.) In addition, the Bear Stearns Defendants allegedly aided Baron in arranging fictitious sales by knowingly recording them as actual trades to deceive regulatory agencies. (*Id.*) And, at times, the Bear Stearns Defendants chose which of Plaintiffs' purchase and sale orders it would execute based on the benefit to themselves. (*Id.* ¶ 30.)

Donald & Co., First Hanover Securities, and Fahnestock & Co. ("Broker Defendants") are alleged to have knowingly engaged in parking and other fictitious transactions to create the appearance of an active market in the manipulated securities. (*Id.* ¶ 31.)

Isaac Dweck, Morris Wolfson, Basil Shiblaq, Ken Stokes, and Fozie Farkash are collectively labeled as the "Individual Defendants."[2] These defendants allegedly assisted Baron in the fraud by, among other things, providing financing and engaging in parking transactions to create the appearance of an active trading market. (*Id.* ¶ 32.) The Individual Defendants were permitted to sell their securities at inflated prices before the stocks crashed to their true values. (*Id.*)

Finally, Plaintiffs claim that Apollo Equities, Barry Gesser, and Michael Ryder ("Apollo Defendants") paid bribes to Baron in exchange for Baron recommending that Plaintiffs and other customers purchase

2. The complaint names various other individuals and entities included in the "Individual Defendants" group. Nathan, Barbara, Morris, Ralph, Millo, Beatrice, Richard, Jack, Isaac, and Hank Dweck held accounts at Baron over which Isaac Dweck allegedly exercised control. (*Id.* ¶ 54.)

Iyad Shiblaq is Basil Siblaq's son. (*Id.* ¶ 55.)

Bank Audi Suisse–Geneve ("Bank Audi") is a financial institution located in Geneva, Switzerland which allegedly maintained securities trading accounts on behalf of Fozie Farkash, who the complaint describes as an employee or client of, or otherwise affiliated with, Bank Audi. (*Id.* ¶ 58.) However, Bank Audi was never served in this case, a fact Plaintiffs concede, and are therefore not a party to this suit. (*See* Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss ["Plf's Mem."], at 1 n. 1.)

Rawai Raes allegedly maintained an account at Baron, but Farkash is claimed to have been the true beneficial owner of that account. (Compl. ¶ 59.)

Arielle, Aaron, Abraham, and Tovie Wolfson are also named among the Individual Defendants, as are the entities over which they maintained control: Anderer Associates, Boston Partners, Wolfson Equities, Turner Scharer, Chana Sasha Foundation, and United Congregation Mesarah. (*Id.* ¶ 60.) Morris, Aaron, and Abraham Wolfson are claimed to have controlled these defendants' accounts. (*Id.* ¶ 61.)

securities such as Jockey Club. (*Id.* ¶ 33.) This agreement, outlined in the discussion of the Jockey Club stocks above, allegedly was meant to, and did, artificially inflate market prices, deceive investors, and cause Plaintiffs to purchase securities at the inflated prices. (*Id.* ¶ 34.)

### D. The Causes of Action and the Motions to Dismiss

Plaintiff's first claim for relief arises under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs allege that they traded in the manipulated securities as a result of Defendants' fraudulent misrepresentations and omissions. (*Id.* ¶ 274.) Defendants' acts allegedly caused Plaintiffs to believe that the price of the stocks was the result of an orderly market, when, in fact, it was a result of Defendants' and Baron's fraudulent manipulation. (*Id.*) Defendants are also accused of using manipulative devices in connection with the purchase and sale of securities, and engaging in practices intended to and with the effect of defrauding Plaintiffs. (*Id.* ¶ 276.)

Defendants are each alleged to have violated section 10(b) and Rule 10b–5 through their own acts; Plaintiffs also claim that Defendants are liable for Baron's acts as control persons of Baron pursuant to section 20(a) and (b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78. (*Id.* ¶¶ 35, 279.) Plaintiffs seek damages on the first cause of action in the amount of $6,500,000. (*Id.* ¶ 288.)

The second cause of action alleges violations of section 9 of the Securities and Exchange Act, 15 U.S.C. § 78i. The basis of this claim is that Defendants knowingly or recklessly manipulated the market for certain securities traded on national securities exchanges, with the purpose of inducing the purchase or sale of the securities. (*Id.* ¶¶ 290–93.) Plaintiffs allegedly relied on the integrity of the market in executing their transactions. (*Id.* ¶ 291.) Damages are sought on this claim in the amount of $6,500,000.

Third, Plaintiffs sue for violations of section 10(b) and Rule 10b–5 based on Defendants knowing or reckless market manipulation. (*Id.* ¶¶ 297–99.) Plaintiffs also seek $6,500,000 in damages on their third cause of action. (*Id.* ¶ 300.)

Plaintiffs fourth assert claims under RICO, 18 U.S.C. § 1962. The alleged pattern of racketeering activity included "tens of thousands of acts" of securities, mail, and wire fraud. (*Id.* ¶ 302.) The complaint describes Baron as an enterprise and Defendants as an enterprise-in-fact; Defendants allegedly participated in both enterprises' conduct through a pattern of racketeering activity. (*Id.* ¶¶ 302–05.) However, the RICO claim is only pursued against the Baron Defendants. Plaintiffs again seek $6,500,000 in damages, which they argue should be trebled, plus costs and attorney's fees. (*Id.* ¶ 310.)

Claims five and six are based on New York State law. The fifth cause of action alleges that Defendants aided and abetted Baron and its brokers in violating Baron's fiduciary duties to Plaintiffs. (*Id.* ¶¶ 315–16.) The sixth cause of action alleges common law fraud. (*Id.* ¶ 318–19.) Plaintiffs seek $6,500,000 in damages on both claims. (*Id.* ¶¶ 317, 319.)

Seven groups of defendants have filed motions to dismiss the complaint. Generally speaking, Defendants move to dismiss on the following grounds: (1) the federal securities fraud and aiding and abetting claims are barred by the applicable statute of limitations; (2) the securities fraud and common-law fraud claims are not pled with sufficient particularity under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u–4(b)(2); and (3) the securities fraud, aiding and abetting, and common-law fraud claims fail to state causes of action under Federal Rule of Civil Procedure 12(b)(6).[3] Defendants further ask that the Court not exercise supplemental jurisdiction over the state-law claims if the federal claims are all dismissed.

## II. DISCUSSION

### A. Legal Standard on Motions to Dismiss

■ The Court can only grant a motion to dismiss pursuant to Rule 12(b)(6) if it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). Failure to sufficiently plead the elements of a cause of action is grounds for dismissal. *Goldin Assocs., L.L.C. v. Donaldson, Lufkin, Jenrette & Securities Corp.*, 2003 WL 22218643, at *1 (S.D.N.Y. Sept. 25, 2003). Plaintiffs, alleging fraud and violations of federal securities laws, must plead the elements of their causes of action with specificity. Fed.R.Civ.P. 9(b) ("In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."); PSLRA, 15 U.S.C. § 78u–4(b)(2). In addition, it is proper to dismiss claims when it is apparent from the complaint and documents referenced therein that they are barred by the applicable statute of limitations. *See In re Gen. Dev. Corp. Bond Litig.*, 800 F.Supp. 1128, 1135–36 (S.D.N.Y.1992) (collecting cases).

### B. Claims Under Sections 9 and 10(b) and Rule 10b–5

#### 1. Statute of Limitations on Plaintiffs' Security Fraud Claims

■ Defendants move to dismiss the complaint on the ground that the security fraud claims are barred by the applicable statute of limitations. Section 9 of the Securities Exchange Act of 1934 states, "No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). The same limitations periods apply to claims based on § 10(b) and Rule 10b–5. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Thus, the first three causes of action here are time-barred unless filed within one year from the date Plaintiffs discovered Defendants' fraud and three years from any violations of the federal securities laws.

#### (a) Three–Year Prong

■ The Court begins its analysis with three-year prong of the statute of limitations because its application is more straightforward. Plaintiffs cannot sue for any act of securities fraud that occurred more than three years before they filed the complaint in this case. *See id.* at 363, 111 S.Ct. 2773. "The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation." *Jackson National Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d

---

**3.** In addition, various Defendants raise other, more minor arguments. For example, the Wolfsons and the entities associated with them, *see supra* note 2, move to dismiss for failure to comply with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the facts. In addition, Kenneth Stokes's Memorandum of Law purports to move for summary judgment as well as to dismiss, but the Court is hard-pressed to locate any arguments regarding a lack of genuine issue of material fact. Both those motions are denied.

697, 704 (2d Cir.1994). Thus, "no claims under ... Section 10(b) of the Exchange Act, or Rule 10b–5 may be brought more than three years after the sale or public offering from which those claims arise." *Stamm v. Corp. of Lloyd's,* No. 96 Civ. 5158(SAS), 1997 WL 438773, at *4 (S.D.N.Y. Jan. 4, 1997). This is true for Plaintiffs' claims under section 9 as well. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773.

The Second Circuit has held that "[t]he statute of limitations in federal securities law cases starts to run on the date that the parties have committed themselves to complete the purchase or sale transaction." *Grondahl v. Merritt & Harris, Inc.,* 964 F.2d 1290, 1294 (2d Cir.1992) (emphasis omitted); *see also In re Colonial Ltd. P'ship Litig.,* 854 F.Supp. 64, 85 (D.Conn. 1994); *Vassilatos v. Ceram Tech Int'l, Ltd.,* No. 92 Civ. 4574(PKL), 1993 WL 177780, at *2 (S.D.N.Y. May 19, 1993). Or, as the Seventh Circuit has put it, "In securities fraud cases, the federal rule is that the plaintiff's cause of action accrues on the date the sale of the instrument is completed." *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1460 (7th Cir.1992) (internal quotation marks and citation omitted).

Thus, any claim of fraud arising from a purchase of securities that occurred prior to February 2, 1996–three years before the complaint was filed–is time-barred. *See Scott v. Steingold,* No. 97C7871, 1999 WL 618109, at *4 (N.D.Ill. Aug. 9, 1999) (stating three-year period begins on date securities sold); *Aizuss v. Commonwealth Equity Trust,* 847 F.Supp. 1482, 1486 (E.D.Cal.1993) ("Of the multitude of purchases listed in the first amended complaint, only three ... are alleged to have occurred within three years of the filing of the original complaint...."). The date of Plaintiffs' investments is the latest possible date on which the three-year limitations period could have begun. *See Isanaka v. Spectrum Techs. USA Inc.,* 131 F.Supp.2d 353, 357 (N.D.N.Y.2001) ("[A] violation of section 10(b) and Rule 10b–5 can take place before and up to the time when the sale of securities took place, but not after the investment is made." (internal quotation marks and citation omitted)).

Most of the securities fraud allegations in the complaint occurred prior to 1996, as Baron ceased its activities in July of that year. (*See* Compl. ¶ 268.) The entire complaint centers on fraudulent activities from 1992 until July 1996, the period in which Baron operated as a securities broker-dealer. (*Id.* ¶ 1.) None of Defendants' allegedly fraudulent acts are claimed to have occurred after July 1996. Thus, the only securities fraud claims that can survive the three-year limitations period are those arising from purchases that took place between February 2, 1996 and Baron's bankruptcy in July.

Throughout the 102–page complaint, only three securities purchases occurred between February and July 1996. In February 1996, a Baron broker made an unauthorized purchase of over 120,000 Jockey Club shares in Plaintiff James Bailey's account. (*Id.* ¶ 240.) On or about April 30, 1996, a Baron broker caused two unauthorized purchase of PaperClip shares, one in Margaret Burgess's account, and the other in the Burgesses' joint account; the Burgesses refused to authorize payment for the transactions and losses were recorded in their accounts. (*Id.* ¶ 255.) All other transactions entered into by Plaintiffs occurred before February 2, 1996. Thus, all of the securities fraud claims arising from the other transactions are barred by the three-year limitations period unless, as Plaintiffs argue, the period was tolled.

### Tolling the Statute of Limitations as to the Bear Stearns Defendants

■ Plaintiffs assert that the class action complaint in *Berwecky v. Bear Stearns & Co.,* No. 97 Civ. 5318 (S.D.N.Y.

filed July 21, 1997), tolled the statute of limitations as to the claims against the Bear Stearns Defendants. Plaintiffs are members of the class in that case, which Judge Sprizzo certified. *See Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65, 71 (S.D.N.Y.2000). Plaintiffs argue that, because they were putative class members, the statute of limitations as to their claims against the defendants in *Berwecky* was tolled, even though Plaintiffs opted out of the class.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that putative class members could move to intervene in the suit after the district court had denied class certification under Federal Rule of Civil Procedure 23, even though the statute of limitations as to the intervening plaintiffs had run. *See id.* at 553–54, 94 S.Ct. 756. The Court held that the filing of the class action "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554, 94 S.Ct. 756. The Supreme Court later held that the *American Pipe* rule also applies to putative class members who file separate suits instead of moving to intervene after a district court denies class certification. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

It must first be noted that there is some dispute over whether the three-year limitation period can ever be tolled. The Supreme Court held in *Lampf*, "Because the purpose of the 3–year limitation is clearly to serve as a cutoff . . . tolling principles do not apply to that period." 501 U.S. at 363, 111 S.Ct. 2773. However, some lower courts have interpreted that statement only to apply to *equitable* tolling and not to principles of *legal* tolling. *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1166–67 (10th

Cir.2000); *Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman*, 277 B.R. 20, 31–32 (S.D.N.Y.2002). The Court therefore will address the merits of Plaintiffs' tolling argument.

This case presents a different question from *American Pipe* and *Crown, Cork.* Those cases involved tolling of the limitations period to allow intervention or separate suits *after* class certification was denied. Plaintiffs commenced this suit *before* Judge Sprizzo made a determination on class certification. And Judge Sprizzo certified the class. These distinctions lead the Court to conclude that the rationale behind *American Pipe* and *Crown, Cork* does not apply here.

The Supreme Court crafted its rulings to uphold "the principal purposes of the class-action procedure–promotion of efficiency and economy of litigation." *Crown, Cork*, 462 U.S. at 349, 103 S.Ct. 2392. Federal Rule of Civil Procedure 23 was meant to encourage putative class members to allow the named plaintiffs to pursue their claims for them. *See id.* at 350–51, 103 S.Ct. 2392. Failing to toll the statute of limitations would force class members to intervene or take other action to protect their rights, and would disenable the efficient function of the class-action system. *See id.* at 350, 103 S.Ct. 2392. Thus, tolling the statute of limitations until after a determination on class certification is made means that putative class members are not forced to bring separate suits or seek to intervene in anticipation of certification being denied.

Tolling the statute of limitations for those individuals who file separate suits before class certification is determined does nothing to promote judicial efficiency. Instead, holding as Plaintiffs urge the Court to do would simply allow putative class members the benefits of the *American Pipe* doctrine free of the concomitant

burden; that is, Plaintiffs here could rely on the class action plaintiffs without having to put their faith in the class representatives to adjudicate their rights.

Other courts have reached the same conclusion. *See, e.g., In re WorldCom, Inc. Secs. Litig.*, 294 F.Supp.2d 431, 450–51 (S.D.N.Y.2003); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F.Supp.2d 188, 221 (E.D.N.Y.2003); *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450 (S.D.N.Y.2001); *Wahad v. City of New York*, 1999 WL 608772, at *5–*6 (S.D.N.Y. Aug. 12, 1999); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 Civ. 897, 1998 WL 474146, at *8 (N.D.Ill. Aug. 6, 1998); *Wachovia Bank & Trust Co., N.A. v. Nat'l Student Mktg. Corp.*, 461 F.Supp. 999, 1012 (D.D.C.1978), *aff'd*, 650 F.2d 342, 346 n. 7 (D.C.Cir.1980).

These cases instruct that plaintiffs who file separate suits *before* class certification is determined cannot benefit from the class action's tolling of the statute of limitations. "Applying the tolling doctrine to separate actions filed prior to class certification would create the very inefficiency that *American Pipe* sought to prevent." *Worldcom*, at 450–51. In *Worldcom*, Judge Cote rejected the same argument that Plaintiffs assert here. In that case, as in this one, the plaintiffs maintained that the statute of limitations should be tolled for class members who filed separate suits *before* a decision was made on class certification. *See id.* at 451–52. In disagreeing with the plaintiffs, Judge Cote aptly noted, "Plaintiffs who choose, as is their right, to pursue separate litigation may not enjoy the benefits of that separate litigation without bearing its burdens. One of the burdens plaintiffs bear is the obligation to commence their actions within the applicable statute of limitations." *Id.*

Therefore, the statute of limitations as to the Bear Stearns Defendants was not tolled by the filing of the *Berwecky* class action. All of their securities fraud claims with the exception of the three trades noted above are barred by the three-year statute of limitations. Accordingly, the first three causes of action asserted by Plaintiffs Fezzani, Cirenaca Foundation, the Blanks, Jane Bailey, Baydel Ltd., Bootlesville Trust, and Cung against the Bear Stearns Defendants are dismissed as time-barred.

### Tolling the Statute of Limitations as All Other Defendants

■ Plaintiffs also maintain that the statute of limitations as to the securities fraud claims against all other Defendants was tolled by the proceedings before the bankruptcy court. Pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa–78lll, a trustee was appointed to stand in the place of Baron as debtor in the bankruptcy proceedings. *See* 15 U.S.C. § 78fff–1. Plaintiffs state that the trustee filed complaints against all Defendants other than the Bear Stearns Defendants on behalf of all those eligible to recover under SIPA, including Plaintiffs. Plaintiffs argue that these actions are akin to class actions and therefore qualify to toll the statute of limitations under *American Pipe* and *Crown, Cork.*

This novel theory is completely barren of precedential support. In any event, even if the trustee's actions were analogous to a class action, the Court has already determined that the purposes of the *American Pipe* tolling doctrine are incompatible with Plaintiffs' actions here. Therefore, this tolling argument must also fail.

The only securities fraud claims not barred by the three-year limitation period are those arising from the three trades noted above. The Court now turns to the application of the one-year prong as to Bailey's and the Burgesses' claims.

### (b) One–Year Prong

The one-year prong of the statute of limitations runs from the date on which Plaintiffs discovered Defendants' fraud. " '[D]iscovery under the 1934 Act limitations provisions includes constructive or inquiry notice, as well as actual notice.' " *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir.1993). A plaintiff is put on inquiry notice when the circumstances were "such as to suggest to a person of ordinary intelligence the probability that" the person was defrauded. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983); *see also In re In–Store Adver. Secs. Litig.*, 840 F.Supp. 285, 288–89 (S.D.N.Y.1993). "To trigger the underlying duty to inquire ... defendant[s] must establish that plaintiff[s] acquired information that suggested the *probability* and not merely the *possibility* that fraud had occurred." *Lenz v. Associated Inns & Rests. Co. of Am.*, 833 F.Supp. 362, 370 (S.D.N.Y.1993).

Once there is a duty to inquire, Plaintiffs' actions dictate the date they are held to have knowledge of the fraud. "The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir.2003). If an inquiry is made, constructive knowledge of the fraud will be attributed to Plaintiffs at the time that they possessed "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir.1979) (internal quotation marks and citations omitted).

Thus, if Plaintiffs possessed actual knowledge of the fraud more than one year before filing the complaint, their securities fraud claims are time-barred. If, more than one year prior to filing suit, Plaintiffs were put on inquiry notice and failed to exercise reasonable diligence, then the securities fraud claims would also be time-barred. Finally, if Plaintiffs acted with reasonable diligence, the Court must determine whether a reasonable investor would have discovered the fraud prior to February 2, 1998 (one year prior to when they filed the complaint).

Defendants argue that Plaintiffs were put on inquiry notice of the fraud as early as 1996 and 1997, when a series of government investigations were initiated as to Baron and its employees. Plaintiffs respond with three arguments: (1) Plaintiffs had no actual or constructive knowledge of Baron's fraud prior to February 2, 1998; (2) even if Plaintiffs had such knowledge, they had no reason to know or to inquire more than they did about Defendants participation in the fraud; and (3) the statute of limitations should be tolled by the filing of the class action and other suits against Defendants.

First, the Court finds that Plaintiffs were on inquiry notice about Baron's fraud more than one year prior to filing suit. The complaint details numerous examples of public information that would have alerted a reasonable person to Baron's fraud many years before this suit was commenced. The Court discusses the most prominent examples.

The SEC began an investigation of Baron's activities in 1993. (Compl.¶ 100.) In May 1994, a civil suit was filed against Baron seeking $2 million in damages for its fraudulent practices. (*Id.* ¶ 116.) A flood of private litigation apparently followed that suit, as well as a formal NASD investigation of Baron. (*Id.*) In July 1995, the NASD imposed sanctions on Baron for unauthorized trading, in what Plaintiffs describe as a "widely publicized settlement." (*Id.* ¶ 155.) In October 1995, Baron and some of its officers were again sued for

fraud. (*Id.* ¶ 212.) Baron and some of its officers filed for bankruptcy in July 1996. (*Id.* ¶ 268.) In May 1997, Baron and its former employees, including the Baron Defendants here (with the exception of Arthur Bressman), were indicted in New York Supreme Court in connection with their fraudulent activities. (*Id.* ¶ 270.)

The aforementioned facts were all in the public domain and thus Plaintiffs, including Bailey and the Burgesses, are charged with knowledge of them. *See Dietrich v. Bauer,* 76 F.Supp.2d 312, 343 (S.D.N.Y. 1999). As the Court in *Dietrich* explained:

> The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, available to the plaintiff providing him with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].

*Id.* (internal quotation marks and citation omitted). The various civil lawsuits, regulatory investigations, and criminal indictments were, to say the least, sufficient storm warnings to put Plaintiffs on inquiry notice at least in May 1997. Thus, Plaintiffs were on inquiry notice more than one year prior to filing the complaint as to all Defendants that they allege participated in Baron's fraud. *See In re Merrill Lynch Ltd. P'ships Litig.,* 7 F.Supp.2d 256, 266 (S.D.N.Y.1997) ("A plaintiff need not be aware of all aspects of the alleged fraud to be on inquiry notice; rather a plaintiff is on inquiry notice 'at the time at which the plaintiff should have discovered the general fraudulent scheme.'" (quoting *In re Integrated Resources, Inc. Real Estate Ltd. P'ships Sec. Litig.,* 851 F.Supp. 556, 568 (S.D.N.Y.1994))).

 Plaintiffs are correct, however, that the issue before the Court is whether they knew or should have known of *Defendants'* fraud prior to February 1998.[4] *See Klein v. Goetzmann,* 810 F.Supp. 417, 425 (N.D.N.Y.1993) (stating issue was whether plaintiffs should have discovered individual defendant's participation in general fraudulent scheme of which plaintiffs had inquiry notice). The Court cannot conclude on the information in the complaint that Plaintiffs could have stated a cause of action for securities fraud against any defendant before February 1998.

### Bear Stearns Defendants[5]

 As the Second Circuit has noted with regard to a similar case also in-

---

4. The Baron Defendants here, with the exception of Arthur Bressman, were all among those indicted in 1997, and later convicted. (*See* Compl. ¶¶ 12, 270, 272.) Plaintiffs had actual or constructive knowledge of the fraudulent acts of Defendants Andrew Bressman, Acosta, O'Hare, Scanni, Brett and Matthew Hirsch, Fox, Simone, Plaia, McAndris, Wolynez, and Gilbert. The claims against the Baron Defendants are therefore time-barred and are accordingly dismissed. The Court has the power to dismiss portions of a complaint *sua sponte* on statute of limitations grounds when, as here, the basis for dismissal is apparent from the complaint. *See Baker v. Cuomo,* 58 F.3d 814, 819 (2d Cir.1995); *Leonhard v.*

*United States,* 633 F.2d 599, 609 n. 11 (2d Cir.1980). However, the application of the one-year statute of limitations as to Arthur Bressman is not so clear-cut; the Court therefore declines to dismiss the securities act claims as to him.

5. The statute of limitations issue as to the Bear Stearns Defendants is further complicated by an arbitral award rendered against Bear Stearns & Co. and Bear, Stearns Securities Corp. That award was confirmed in an opinion by Judge Scheindlin. *See McDaniel v. Bear, Stearns & Co.,* 196 F.Supp.2d 343 (S.D.N.Y.2002). Arbitral awards do have collateral estoppel effect on a legal issue if the issue was raised, actually litigated and decid-

volving Bear Stearns as a clearing broker, "[T]his is not a typical storm warnings case...." *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 103 (2d Cir.2003). In *Levitt*, the Second Circuit reversed Judge Spatt's exhaustive opinion in which he had determined that the plaintiffs had constructive knowledge of Bear Stearns' fraud more than one year prior to filing suit. *See id.* at 104. An earlier suit had been filed against Bear Stearns alleging participation in the same fraudulent scheme involved in the suit before Judge Spatt. *Id.* at 103. The *Levitt* court held that there were some allegations against Bear Stearns in the suit pending before Judge Spatt that had not been made in the prior case. *Id.* The district court erred in not examining whether any of the additional factual allegations would have been necessary for Plaintiffs to have known in order to state a claim against Bear Stearns more than one year before the complaint was filed. *See id.* Additionally, the court held that the knowledge derived or imputed from the prior suit against Bear Stearns must have been sufficient to state a claim against Bear Stearns as a primary wrongdoer, that is, one directly liable under the federal securities laws, and not merely as an aider and abettor. *Id.*

The Bear Stearns Defendants maintain that the complaint establishes Plaintiffs' actual or constructive knowledge of their alleged participation in the fraud, at the latest, by July 1997 when the *Berwecky* class action was filed. It would have taken no Herculean effort to identify Bear Stearns' integral relation to Baron's operations from public information available before 1997, and, after the class action was filed, to identify a potential claim against

the Bear Stearns Defendants for securities fraud. However, the Second Circuit's decision in *Levitt* suggests that such identification is not enough.

First, this Court would need to determine that the allegations raised against Bear Stearns in the *Berwecky* suit were sufficient to state a cause of action against the Bear Stearns Defendants for direct violations of the securities laws. The Second Circuit's opinion would also require this Court to determine whether the facts alleged in *Berwecky* were sufficient fodder for Plaintiffs here to allege securities fraud claims then *with sufficient particularity* to meet the pleading requirements of Rule 9(b) and the PSLRA. *See id.* at 103–04. In sum, the Court would need to decide whether the complaint in *Berwecky* should survive a motion to dismiss for failure to state a claim and failure to plead with particularity.

Thus, the *Levitt* case erects high barriers to dismissal of a suit under the one-year limitations period against secondary wrongdoers. The facts stated in the complaint, together with the documents referenced therein, provide no basis for making these determinations. Therefore, the Bear Stearns Defendants' motion to dismiss under the one-year prong must be denied as to James Bailey's and the Burgesses' securities fraud claims.

### All Other Defendants

If a prior suit involving the fraud allegations stemming from the same acts by the same defendant is not enough to constitute discovery under the statute of limitations, then neither are the other allegations in the complaint. While the Court finds that

---

ed, the party had full and fair opportunity to litigate the issue, and resolution of the issue was necessary to support a valid judgment on the merits. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998). However, neither the award nor the judgment confirming

it actually decided the statute of limitation issue. The arbitral award does not collaterally estop consideration of whether the federal securities claims are time-barred as to the Bear Stearns Defendants.

Plaintiffs certainly had a duty to inquire as to the overall scheme at the latest in 1997 when the Baron Defendants were indicted, the Court cannot factual determine at this stage whether a reasonable investor would have discovered the other Defendants' fraud any earlier than February 2, 1998. The Court therefore holds that Bailey's and the Burgesses first three causes of action against Defendants are not barred by the one-year limitations period.

The Court concludes that all Plaintiffs' securities fraud claims are time-barred under the three-year limitations period except for those brought by the Burgesses and James Bailey. Thus, the first three causes of action brought by Plaintiffs Fezzani, Cirenaca Foundation, the Blanks, Jane Bailey, Baydel Ltd., the Bootlesville Trust, and Cung are dismissed. The Court shall refer to Bailey and the Burgesses hereinafter as "Remaining Plaintiffs."

### 2. Failure to State a Claim / Particularity of Allegations Regarding Remaining Plaintiffs Transactions

Defendants also move to dismiss all three securities fraud claims on the grounds that Remaining Plaintiffs have failed to meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the PSLRA, and have failed to state a claim under Rule 12(b)(6).

■■■■ "To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996). Section 10(b) and Rule 10b–5 also prohibit market manipulation. To state a claim on this theory, "Plaintiffs must plead with particularity the manipulative scheme itself, the intent to defraud the investing public, reliance on the integrity of the market (*i.e.,* that they believed it was *not* manipulated) and resulting damages." *In re Initial Public Offering Secs. Litig.,* 241 F.Supp.2d 281, 296 (S.D.N.Y.2003).

■■■ On a market manipulation theory under section 9 a complain must allege: "(1) a series of transactions in a security creating actual or apparent trading in that security *or* raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price." *Connolly v. Havens,* 763 F.Supp. 6, 11 (S.D.N.Y.1991) (internal quotation marks and citation omitted).

■■■ Scienter, the requisite state of mind, is defined as "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA states with regard to scienter:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Thus, "[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). This standard can be satisfied by either demonstrating motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* Defendants argue that Plaintiffs have failed to satisfy the standard on both their misrepresenta-

tion/omission and market manipulation claims.

■ Remaining Plaintiffs' allegations must satisfy the standard as to *each defendant.* *See In re Blech Secs. Litig.,* 961 F.Supp. 569, 580 (S.D.N.Y.1997) (*"Blech II"*). However, the only relevant allegations relate to PaperClip and Jockey Club securities because these are the only securities that Remaining Plaintiffs purchased.

■ As an initial matter, the Court rejects the argument that Remaining Plaintiffs lack standing under section 10(b) and Rule 10b–5 because all their purchases were unauthorized. The Second Circuit has held that "claims under Rule 10b–5 arise when brokers purchase or sell securities on their clients' behalf without specific authorization." *Caiola v. Citibank, N.A., NY,* 295 F.3d 312, 323 (2d Cir.2002). In *Caiola,* the court determined that the plaintiff had sufficiently pled the purchase or sale of securities when he alleged that Citibank had made purchases on his behalf; it was irrelevant that he did not authorize those purchases. *Id.* at 324.

This result is also dictated by the Supreme Court's decision in *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). In *Zandford,* the Court construed the phrase "in connection with the purchase or sale of any security" to encompass a broker's unauthorized sales of customer securities for the broker's own benefit. *See id.* at 820–21, 122 S.Ct. 1899. Because the fraud coincided with the sale of securities, it fell within section 10(b)'s flexible ambit. *See id.* at 822–23, 122 S.Ct.

1899; *see also In re Enron Corp. Securities, Derivative, & ERISA Litig.,* 235 F.Supp.2d 549, 577–78 (S.D.Tex.2002). Therefore, Remaining Plaintiffs' claims do not fail merely because Baron made the stock purchases without their permission.

### a. Bear Stearns Defendants [6]

### Allegations of Misrepresentations/Omissions

■ The Bear Stearns Defendants attack the securities fraud claims based on misrepresentations and omissions on the following grounds: (1) all misrepresentations and omissions were made by Baron and its employees, not by the Bear Stearns Defendants; (2) the complaint fails to allege that Plaintiffs relied on any of the Bear Stearns Defendants' statements or omissions; and (3) there are no allegations that their statements or omissions caused the economic loss claimed. In addition, Harriton argues, with regard to the Paper-Clip allegations, that Plaintiffs fail to claim he took any direct action or affirmative act on which they relied.

The complaint alleges that the Bear Stearns Defendants were "on notice of" the unauthorized trading in Bailey's account because, as clearing broker, Bear Stearns generated customer confirmations of trades and made a daily tally of commissions. (Compl.¶ 241.) In addition, the Bear Stearns Defendants were "likely aware of Jockey Club's reputation in the community," and "noticed that" Baron was not charging commissions for selling shares of Jockey Club when it normally

---

**6.** At this point in the proceedings, the Court need not determine whether the arbitral award noted above, *see supra* note 5, estops the Bear Stearns Defendants' arguments here. Plaintiffs were not parties to the arbitration, but ostensibly seek to assert offensive nonmutual collateral estoppel against the Bear Stearns Defendants. While Plaintiffs may be able to assert such estoppel some time in the future, *see Parklane Hosiery Co. v. Shore,* 439

U.S. 322, 331–32, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), this is not the occasion for the Court to make that conclusion. The Court's only obligation now is to decide whether Plaintiffs have sufficiently *pled* a cause of action, not whether Defendants can mount a substantive defense against the complaint. Therefore, the Court does not consider the arbitral award's effect at this time.

charged excessive commissions. (*Id.* ¶ 241–42.) With regard to PaperClip, the Bear Stearns Defendants allegedly were informed of the "bait-and-switch" scheme and overselling during the initial public offering. (*Id.* ¶¶ 196–200.) Harriton was informed that Baron would use the fraudulently obtained funds to clear up its trade-date debit, something that would benefit the Bear Stearns Defendants.

Plaintiffs argue that Bear Stearns made material misrepresentations when it sent the confirmation notices underreporting commissions earned by Baron, and that the notices were an intentional misrepresentation that the price paid for the security was reasonably related to that in an open market. In addition, Bear Stearns sent monthly account statements stating the market value of stocks in each customer's portfolio; market values which the Bear Stearns Defendants allegedly knew were false. Finally, Bear Stearns allegedly sent a welcome letter to Plaintiffs, presumably also to Remaining Plaintiffs, designed to inspire Plaintiffs to feel confident about investing in Baron, something the Bear Stearns Defendants knew was not warranted.

Along with these misrepresentations, Plaintiffs submit that the complaint adequately alleges the Bear Stearns Defendants' omissions because they knew of, but failed to disclose Baron's manipulative schemes, the high commissions that Baron was receiving, Baron's nearly continuous insolvency, and that the price of the securities would collapse if Baron went out of business.

 The misrepresentations alleged do not state a claim against the Bear Stearns Defendants with regard to Remaining Plaintiffs' purchases of Jockey Club and PaperClip securities. First, the confirmation notices and market accounts misrepresenting the value of the securities are irrelevant because they occurred after-the-

fact. The gravamen of a securities fraud claim based on misrepresentations or omissions is that the plaintiff made a securities transaction that he or she would not have made had the defendant spoke or refrained from speaking. *See Kalnit v. Eichler,* 85 F.Supp.2d 232, 240 (S.D.N.Y. 1999). Remaining Plaintiffs cannot claim that the confirmation notices or monthly statements caused their injuries because their injuries had already occurred, that is, the stock purchases had already been made. The fraud was complete once the purchases were made. *See Alfadda v. Fenn,* 935 F.2d 475, 478–79 (2d Cir.1991) (holding securities fraud complete upon purchase of securities); *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 598 (2d Cir.1991) (holding no claim for securities fraud when purchase of securities completed before alleged fraud occurred); *Dietrich,* 76 F.Supp.2d at 341 ("[A]n alleged fraud cannot be in connection with the purchase or sale of a security if the transaction occurs prior to the fraud."); *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1080 (S.D.N.Y.1987) ("Where the only manipulative or deceptive acts identified in a complaint occur after a challenged securities purchase or sale, a court must dismiss the complaint as failing to state a cause of action for federal securities fraud.").

Here, there are no allegations of additional purchases by or on behalf of Remaining Plaintiffs after they received a confirmation notice or a monthly account statement. Thus, Remaining Plaintiffs can seek no solace in their allegations regarding the confirmation notices and account statements.

 Second, Remaining Plaintiffs cannot predicate liability on the "welcome letter." Plaintiffs argue that the welcome letter was a material misrepresentation because the Bear Stearns Defendants knew

that Baron was not worthy of the confidence and sense of security that the letter was meant to inspire. The welcome letter cannot be a misrepresentation on the part of the Bear Stearns Defendants because it was issued by Baron. (*See* compl. ¶ 156.) The complaint merely alleges that Bear Stearns approved the letter, not that it wrote or distributed it. (*Id.*) The Bear Stearns Defendants cannot be held liable for misrepresentations that they did not make. *See Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld, & Sorkin,* 135 F.3d 837, 842–43 (2d Cir.1998); *Scone Invs. L.P. v. Am. Third Mkt. Corp.,* No. 97 Civ. 3802, 1998 WL 205338, at *6–7 (S.D.N.Y. April 28, 1998). This result is dictated by the fact that section 10(b) and Rule 10b–5 do not provide a cause of action for aiding and abetting securities fraud. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Plaintiffs suggest that the Second Circuit's decision in *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998), supports their claims regarding the Bear Stearns' Defendants misrepresentations. That case, however, dealt with the liability of a brokerage firm employee for participation in a market manipulation scheme. *See id.* at 112. It lends little aid to Plaintiffs' allegation in the misrepresentation/omission context. In any event, the court in *U.S. Environmental* held that the defendant employee could be held liable as a primary violator of section 10(b) when *he executed trades,* at the direction of a stock promoter, that he knew or should have known were manipulative. *See id.* at 110. Thus, it was no great stretch to hold the defendant accountable as a primary violator. Here, Baron sent the welcome letter, not the Bear Stearns Defendants. And, while Bear Stearns sent the confirmation notices and account statements, they were sent after the harm occurred. Therefore, Remaining Plaintiffs have not stated a claim against the Bear Stearns Defendants based on material misrepresentations.

 Similarly, the alleged omissions are insufficient to state a claim under section 10(b) and Rule 10b–5. A duty to disclose "arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Grandon v. Merrill, Lynch & Co.,* 147 F.3d 184, 189 (2d Cir.1998) (internal quotation marks omitted) (quoting *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). It has been consistently held that clearing brokers owe no duty of disclosure to customers of introducing brokers such as Baron. *See Connolly,* 763 F.Supp. at 10; *Dillon v. Militano,* 731 F.Supp. 634, 634 (S.D.N.Y.1990); *In re Blech Secs. Litig.,* 928 F.Supp. 1279, 1295–96 (S.D.N.Y.1996) (*"Blech I"*).

Plaintiffs argue that the cases cited above to not change the rule that "once one undertakes to speak, that disclosure may not be misleading." (Plfs.' Mem. at 26.) This proposition of law says nothing about the Bear Stearns Defendants' *omissions,* but relates to their purported misrepresentations; a claim, the Court has already held, that cannot be sustained.

The Court holds that the complaint fails to state a claim against the Bear Stearns Defendants for securities fraud based on misrepresentations and omissions. Therefore, Remaining Plaintiffs' first cause of action against the Bear Stearns Defendants is dismissed.

### Allegations of Market Manipulation

 Defendants, including the Bear Stearns Defendants, argue that Plaintiffs' claim under section 9 of the Securities Exchange Act must fail because the complaint does not allege that the manipulated

securities were registered on a national securities exchange.

Section 9 prohibits certain acts of manipulation with regard to securities traded on a national securities exchange. *See* 15 U.S.C. § 78i(a). Here, the complaint alleges that the manipulated securities were traded through the National Association of Securities Dealers Automated Quotations System ("NASDAQ"). (Compl.¶ 293.) This is the only allegation regarding the markets on which the manipulated securities were traded. NASDAQ has been held not to be a national securities exchange within the meaning of section 9. *See Connolly,* 763 F.Supp. at 12 n. 4; *Martin v. Prudential–Bache Secs., Inc.,* 820 F.Supp. 980, 983–84 (W.D.N.C.1991); *Cowen & Co. v. Merriam,* 745 F.Supp. 925, 930–31 (S.D.N.Y.1990); *Cammer v. Bloom,* 711 F.Supp. 1264, 1277 n. 18 (D.N.J.1989); *Gavron v. Blinder Robinson & Co.,* 115 F.R.D. 318, 320 n. 3 (E.D.Pa.1987).

Plaintiffs contest this conclusion, but cite no case holding that NASDAQ qualifies as a national securities exchange; the Court has located no such precedent. Plaintiffs argue that NASDAQ has dramatically changed since these cases were decided and is now the most important national securities exchange as the volume of trading surpasses that on the New York Stock Exchange. However, NASDAQ's volume of trading and national importance say nothing about the way in which securities are traded there. *See Bd. of Trade v. SEC,* 923 F.2d 1270, 1275 (7th Cir.1991) ("[W]e can be certain that volume plays no role in the determination of whether a market constitutes an exchange....") (Flaum, J., dissenting).

Given the unanimous authority on this issue and Plaintiffs' failure to articulate any justification for departing from that authority, the Court holds that NASDAQ is not a national securities exchange, and thus Remaining Plaintiffs have failed to state a claim under section 9 of the Securities Exchange Act. The second cause of action is dismissed as to all Defendants. Market manipulation claims under section 10(b) and Rule 10b–5, however, do not require allegations of trading on a national securities exchange.

■ The Bear Stearns Defendants maintain that the third cause of action should also be dismissed against them because: (1) clearing brokers cannot be held liable for the actions alleged in the complaint; (2) the allegations of manipulation in PaperClip stock only relate to the initial public offering and the Burgesses have not alleged that the purchases occurred during the initial offering; (3) the complaint fails to adequately allege which manipulative acts were taken by which defendant, improperly lumping defendants together.

■ "Market manipulation comprises a class of conduct prohibited by Section 10(b), which typically involves 'practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity.'" *In re Blech Secs. Litig.,* No. 94 Civ. 7696, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) *("Blech III")*. "A plaintiff asserting a market manipulation claim must allege direct participation in a scheme to manipulate the market for securities." *Blech II,* 961 F.Supp. at 580. As has been stated above, no claim can lie against the Bear Stearns Defendants for aiding and abetting Baron's market manipulation in the PaperClip and Jockey Club securities. *See Central Bank of Denver,* 511 U.S. at 191, 114 S.Ct. 1439. However, similar claims of market manipulation against Bear Stearns have withstood motions to dismiss in some circumstances. *See Blech III,* 2002 WL 31356498, at *4

In *Blech III,* Judge Sweet confronted similar claims as the Court does here.

Judge Sweet distinguished between allegations of primary and secondary liability:

> When Plaintiffs allege mere clearing conduct against Bear Stearns, such allegations amount to no more than a nonexistent claim of aiding and abetting because, at most, they allege only that Bear Stearns knowingly and substantially assisted ... [in the fraud] by clearing the fraudulent trades.... However, the Complaint crosses the line dividing secondary liability from primary liability when it claims that Bear Stearns 'directed' or 'contrived' certain allegedly fraudulent trades. Under these circumstances, the Complaint adequately alleges that Bear Stearns engaged in conduct, with scienter, in an attempt to affect the price of ... securities.

*Id.* Here, the allegations against the Bear Stearns Defendants, and certainly against Harriton, do not cross the threshold laid out in *Blech III*. The complaint alleges that the Bear Stearns Defendants were "on notice" of Baron's unauthorized trading in Jockey Club, were "closely monitoring" the transactions, and were "likely to have been aware of Jockey Club's reputation in the community." (Compl.¶¶ 241, 242.)

Similarly, with regard to Baron's dealings in PaperClip, the Bear Stearns Defendants had knowledge of Baron's fraud through conversations between Harriton and Andrew Bressman. (*Id.* ¶¶ 197–99.) Harriton allegedly "agreed that Bear Stearns would go along with the plan." (*Id.* ¶ 199.) In contrast, the plaintiffs in *Blech III* alleged that Bear Stearns "contrived and agreed to fund" the fraudulent sale of certain securities. 2002 WL 31356498, at *4. Knowledge of Baron's fraud and clearing fraudulent transactions are insufficient to make the Bear Stearns Defendants primary violators on the basis of market manipulation. *See id.*

All the complaint alleges, with regard to the market manipulation of PaperClip and Jockey Club, is that the Bear Stearns Defendants knew of Baron's fraud and cleared the transactions that were fraudulently made. In a regime under which aiding and abetting liability existed, Remaining Plaintiff's market manipulation claims against the Bear Stearns Defendants might survive. They have not, however, stated a claim for primary violations. Remaining Plaintiff's third cause of action against the Bear Stearns Defendants accordingly is dismissed.

### b. Broker Defendants

■ There are no allegations in the complaint that the Broker Defendants committed any fraudulent acts specifically with regard to Jockey Club and PaperClip securities. The complaint merely states that the Broker Defendants conspired with Baron "to create an artificial appearance of trading activity through repeatedly 'parking' of Baron securities in customer and proprietary trading accounts at each firm." (Compl.¶ 123.) Such pleading is entirely insufficient.

■ It may be true that market manipulation claims are not held to as high a pleading standard as other fraud claims because the "facts relating to a manipulation scheme are often known only by the defendants." *Baxter v. A.R. Baron & Co.*, No. 94 Civ. 3913, 1996 WL 586338, at *8 (S.D.N.Y. Oct. 11, 1996). However, a complaint still must state "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Baxter v. A.R. Baron & Co.*, No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995). The general statements noted above do not specify which Defendants were involved, which securities were manipulated in what way,

how such manipulation affected the market for the *specific* security, and in what way Remaining Plaintiffs were harmed by the manipulation. Accordingly, the third cause of action is dismissed as to the Broker Defendants for failure to plead with particularity. The first cause of action is dismissed for failure to state a claim.

### c. Individual Defendants

The extent of the allegations against the Individual Defendants are that some of them traded in PaperClip securities. None are mentioned in connection with the Jockey Club scheme. Therefore, only the Burgesses may have a sustainable claim against the Individual Defendants because James Bailey's account experienced no transactions in PaperClip stocks. Beatrice, Isaac, Jack, Morris, Nathan, and Ralph Dweck received shares in the initial public offering of PaperClip. (Compl.¶ 259.) Basil Shiblaq received 80,-000 shares in the PaperClip initial offering, more than the number for which he subscribed. (*Id.* ¶ 202.) Individual Defendants are also alleged to have profited from sales of PaperClip. (*Id.* ¶ 262.) Thus, the securities fraud claims against these defendants rest on a few allegations that they purchased or sold, and profited from, PaperClip securities.

No misrepresentations or even omissions have been alleged on the part of the Individual Defendants. The securities fraud claims against the Individual Defendants focus on market manipulation. However, the complaint is also insufficient to state a claim for market manipulation against them.

As with many other areas of the complaint, Plaintiffs' claims against the Individual Defendants for market manipulation suffer from the defect of group pleading. The only specific allegations as to the Individual Defendants are not adequately specific to establish a claim for market manipulation. Allegations that some Individual Defendants owned PaperClip securities and benefited from the market manipulation performed by Baron is not enough. *See Baron,* 1995 WL 600720, at *7. Furthermore, the complaint contains no specifications as to how the Individual Defendants' actions affected Remaining Plaintiffs' transactions (which were all unauthorized).

Finally, there are no allegations as to how each Individual Defendant acted with scienter. Indeed, in the few instances when the complaint mentions an Individual Defendant by name in connection with manipulated securities, there are no allegations of any intent to deceive. The Burgesses' third cause of action is dismissed as to the Individual Defendants for failure to plead with sufficient particularity. Their first cause of action is dismissed for failure to state a claim, as are both James Bailey's first and third causes of action against the Individual Defendants.

### d. Apollo Defendants

The complaint does not allege that the Apollo Defendants made any statements or had a fiduciary duty to speak. Neither does it allege that Remaining Plaintiffs relied on anything said or not said by the Apollo Defendants. Plaintiffs argue that the Apollo Defendants can be held liable for misrepresentations or omissions regarding Jockey Club securities because they masterminded and directly participated in the fraudulent conduct. As Plaintiffs themselves recognize, however, there is difference between violations based on misrepresentations or omissions and those based on market manipulation. *See* Rule 10b–5, 17 C.F.R. § 240.10b–5(a), (b) (distinguishing between violations through any "device, scheme, or artifice to defraud," and material misrepresentations or omissions).

Plaintiffs rely on the general principle stated in *SEC v. First Jersey Securities., Inc.*, 101 F.3d 1450 (2d Cir.1996), that "[p]rimary liability may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." *Id.* at 1471 (internal quotation marks omitted). The court in *First Jersey Securities* held that the sole owner of a broker-dealer could be held liable as a primary violator of section 10(b) and Rule 10b–5 when the broker-dealer engaged in widespread fraud against its customers. *See id.* The court determined that the individual owner was properly liable because he helped plan the pattern of trading that violated the securities laws. *See id.* at 1472. *First Jersey Securities*, therefore, stands for the proposition that one intricately involved in the planning and execution of a *fraudulent scheme* can be held accountable as a primary violated of section 10(b) and Rule 10b–5. There is little in the Second Circuit's discussion to support the contention that the Apollo Defendants could be held liable for Baron's misrepresentations or omissions.

Plaintiffs also cite *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir. 1991), and *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 676 F.Supp. 458, 468–69 (S.D.N.Y. 1987). The court in *Breard* held that the law firm that *wrote* an offering memorandum replete with material misrepresentations could be held liable by individuals who relied on the memorandum in purchasing shares in the company. *See* 941 F.2d at 143–44. Similarly, in *Union Carbide*, the court concluded that an investment firm could be held liable as a primary violator for fraudulent sales projections that it prepared but that were officially disseminated by its corporate client. *See* 676 F.Supp. at 467–69. Both *Breard* and *Union Carbide* involved defendants who *prepared* the fraudulent statements that were then disseminated to the public by another entity. Here, not only did the Apollo Defendants not prepare any fraudulent statements, the complaint does not identify any fraudulent statements at all in connection with Jockey Club securities.

However, James Bailey has established a claim against the Apollo Defendants on the basis of market manipulation. In contrast to the other Defendants, there are sufficient allegations against the Apollo Defendants relating to their role in the Jockey Club scheme. It was the Apollo Defendants who approached Baron about causing shares to be sold to Baron customer accounts. (Compl.¶ 233.) The Apollo Defendants also proposed to split the proceeds of the fraudulent transactions with Baron brokers. (*Id.*) The complaint then details how the Apollo Defendants and Baron carried out the plan. (*Id.* ¶¶ 234–36.) As part of the scheme, Bailey received unwanted securities that caused him to lose funds from his account. Thus, there are sufficient allegations regarding the scheme to defraud and the harm suffered. *See In re Initial Public Offering Secs. Litig.*, 241 F.Supp.2d at 296. There are no allegations, however, regarding the Apollo Defendants' manipulation of PaperClip securities, the only securities allegedly received by the Burgesses. Thus, the Burgesses have not stated a claim for market manipulation against the Apollo Defendants.

The complaint also adequately pleads scienter as to the Apollo Defendants. The facts alleged give rise to a strong inference that the purpose of the Apollo Defendants' plan was to defraud the public. This intent is inferred from their bribe of Baron to sell stock that was without value, and their proposition that they and Baron split the proceeds of the sales. The complaint sufficiently alleges con-

scious misbehavior and motive/opportunity to commit fraud.

The Court therefore concludes that Bailey's third cause of action against the Apollo Defendants survives a motion to dismiss. Remaining Plaintiffs' first cause of action and the Burgesses' third cause of action are dismissed for failure to state a claim.

## C. Claims Based On Control Person Liability

■ The complaint alleges that the Bear Stearns Defendants, Kenneth Stokes, the Dwecks, and the Wolfsons and the entities associated with them, *see supra* note 2, were control persons of Baron who are therefore responsible for Baron's wrongdoing.[7] (Compl.¶ 35.)

■ Section 20(a) of the Securities Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a claim for control person liability, the complaint must allege: (1) a primary violation by Baron, and (2) control of Baron by each defendant. *First Jersey Secs., Inc.*, 101 F.3d at 1472 (citations omitted). There is some

dispute over whether a third requirement is that the defendant acted culpably in the fraud. *See Neubauer v. Eva–Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y.1994) (collecting cases on both sides of the dispute). The one and three-year statute of limitations also apply to claims under section 20. *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 349 (2d Cir.1993) (applying statute of limitations in section 9(e) to claims under section 20). Thus, any claims based on primary violations by Baron that occurred before February 2, 1996 are time-barred.

There is no argument that the complaint fails to allege primary violations by Baron; instead, the defendants who are named in this count maintain that the complaint fails to allege control and culpable conduct.[8]

■ "[C]ontrol over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction or the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Id.* at 1472–73 (quoting 17 C.F.R. § 240.12b–2). Allegations of influence are not the same as the power to direct the management and policies of the primary violator. *See Blech II*, 961 F.Supp. at 587. "Actual control is essential to control person liability." *Id.* at 586. However, the Rule 9(b) heightened pleading standard does not apply to averments of control person liability. *See Duncan v. Pencer*, No. 94 Civ. 0321(LAP),

---

**7.** The Court notes that the complaint is ambiguous as to which defendants are sued under a control person theory. (*Compare* Compl. ¶ 35, *with id.* ¶¶ 279–80.) As with many areas of the complaint, the resort to group pleading makes it difficult to distinguish which causes of action are asserted against which defendants. However, Plaintiffs' Memorandum of Law at 46, states that only Defendants that the Court has listed above are allegedly liable as control persons, as well as "certain others not relevant to the

pending motions." The Court is not clear on who those "others" may be, but only considers the motions of Defendants named in Plaintiffs' Memorandum of Law. Plaintiffs have waived their arguments as to any other Defendants who have moved to dismiss the control person cause of action and those motions are accordingly granted.

**8.** The Bear Stearns Defendants, however, rest their arguments entirely on the "control" requirement.

1996 WL 19043, at *18 (S.D.N.Y. Jan. 18, 1996).

Here, the complaint provides sparse facts regarding Defendants' control over Baron, a defect Plaintiffs recognize in their Memorandum of Law. Plaintiffs argue that the Wolfsons, the Dwecks, and Kenneth Stokes "played a significant role in the relationship between Baron and other ... Defendants." (Plfs.' Mem. at 50.) The Wolfsons were "important as parking participants, a key link to Bear Stearns, and recipients of enormous payments." (*Id.*) "Stokes was also a participant in parking...." (*Id.*) Participation, even significant participation, in Baron's scheme to defraud is not equivalent to directing Baron to engage in that scheme. The complaint therefore fails to state a cause of action under section 20(a) as to the Wolfsons and the entities associated with them, the Dwecks, and Stokes.[9]

Plaintiffs contend that the Bear Stearns Defendants actually controlled Baron because, at certain times, they took over Baron's offices and executed transactions, as well as approved or disapproved of all of Baron's trading orders after November 1995. According to the complaint, towards the end of 1995, Bear Stearns assumed control of all trading activities at Baron and sent its employees to Baron's offices to enforce that control. (Compl.¶ 208.) However, as noted above, the statute of limitations bars this claim and no tolling doctrine applies. Therefore, the claims against the Bear Stearns Defendants are time-barred.[10]

### D. Aiding and Abetting Breach of Fiduciary Duty

 Plaintiffs also seek to hold all Defendants liable for aiding and abetting Baron's breach of its fiduciary duties to Plaintiffs. Defendants move to dismiss this claim on a variety of grounds. The majority of the claim is time-barred because New York imposes a three year statute of limitations on suits for breach of fiduciary duties. *See* N.Y. C.P.L.R. 214(4) (setting three-year limitations period for damages to property); *see also Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F.Supp. 494, 507 (S.D.N.Y.1992) (dismissing aiding and abetting breach of fiduciary duties claims because time-barred); *Loengard v. Santa Fe Indus., Inc.*, 573 F.Supp. 1355, 1359 (S.D.N.Y.1983) (same). Any aiding and abetting claims that arose from Baron's actions before February 2, 1996 are accordingly barred by the statute of limitations.

For those claims that are not time-barred, Plaintiffs must allege (1) Baron's breach of its fiduciary duties, (2) knowledge of that breach by each defendant, (3) substantial assistance by the defendants in the breach, and (4) a nexus between Plaintiffs' injuries and Defendants' conduct. *See Ackerman*, 887 F.Supp. at 508. Only the Burgesses and James Bailey are alleged to have sustained losses. The complaint adequately alleges that Baron violated its fiduciary duties to Remaining Plaintiffs through its unauthorized transactions in their accounts. *See De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1306 (2d Cir.2002). However, the

---

**9.** Plaintiffs' reliance here on the difference between the pleading standards under Rule 9 and under Rule 8 is not no avail. The Court does not hold that the complaint is insufficiently vague or unspecific, but that Plaintiffs' control person claims must be dismissed under Rule 12(b)(6).

**10.** The Court would also dismiss the control person claims against Harriton for failure to state a claim. Plaintiffs' seek to hold Harriton responsible based on tertiary liability–his control of Bear Stearns, which in turn allegedly controlled Baron. Plaintiffs' cannot stretch the concept of control liability so far.

complaint does not state in connection with any of the unauthorized transactions that any defendant participated in the breach of fiduciary duties. The one exception is the allegations with regard to the Apollo Defendants. The complaint alleges that the Apollo Defendants proposed that Baron place Jockey Club securities in their customers' accounts with authorization, and that, in February 1996, Baron brokers made an unauthorized purchase for James Bailey's account. (Compl.¶¶ 234–40.) Therefore, all aiding and abetting claims are dismissed except for James Bailey's claim against the Apollo Defendants.

### E. Common–Law Fraud

 Finally, Defendants move to dismiss the sixth cause of action for common-law fraud. To avoid a motion to dismiss, Plaintiffs must plead "a material false representation, an intent to defraud thereby, and reasonable reliance on the representation causing damage...." *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) (internal quotation marks and citations omitted). In response to Defendants' arguments that the complaint fails to identify which defendants made what statements on what dates, Plaintiffs argue that each defendant can be held liable for the misrepresentations of their codefendants because they were involved in a conspiracy, and that no misrepresentations need be pled because fraud through market manipulation is actionable under New York law. The Court rejects both these arguments.

Plaintiffs rely on *First Federal Savings & Loan Association of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427, 443 (S.D.N.Y.1986), for the proposition that Defendants are liable for Baron's fraudulent acts because Defendants were coconspirators with Baron. The plaintiffs in *First Federal,* however, had sued the defendants for civil conspiracy to defraud.

*See id.* Here, the cause of action was for common-law fraud and made no mention of civil conspiracy. Considering a separate cause of action now would effectively allow Plaintiffs to amend their complaint through a memorandum of law on a motion to dismiss. This the Court cannot permit. *See Goel v. U.S. Dep't of Justice,* No. 03 Civ. 0579(HB), 2003 WL 22047877, at *1 n. 4 (S.D.N.Y. Aug. 29, 2003) ("Allegations in a memorandum of law ... cannot serve as a means to amend ... [a] complaint and therefore this additional allegation will not be treated as part of ... [the] complaint.").

 Additionally, Plaintiffs maintain that there is a cause of action under New York law for fraud based on market manipulation. There is case law in this district to support their contention. *See Blech II,* 961 F.Supp. at 587; *Minpeco, S.A. v. ContiCommodity Servs., Inc.,* 552 F.Supp. 332, 336–38 (S.D.N.Y.1982). The court in *Minpeco* confronted a situation in which the plaintiffs brought suit for common-law fraud based on the defendants' actions rather than their statements. *See* 552 F.Supp. at 336. The plaintiffs sought to establish liability based on the defendants' fraudulent acts in manipulating the silver market. *See id.* at 334–35. The court first stated that New York law imposed no duty to speak on the defendants who were on opposite sides of the market from the plaintiffs. *See id.* Finding no New York cases directly on point, the court then reasoned that "a duty to speak does arise where defendants have engaged in 'some act or conduct which deceived plaintiffs.'" *Id.* (quoting *Moser v. Spizzirro,* 31 A.D.2d 537, 295 N.Y.S.2d 188, 189 (2d Dep't 1968)). The gravamen of a common-law fraud claim is the fraudulent production of a false impression in the mind of another, regardless of whether the result was carried out by word or deed. *Id.* The court concluded that the complaint stated

a cause of action for fraud because the defendants' actions in creating an artificial price in the silver market lured the plaintiffs into the market to their detriment. *Id.* at 337.

Even assuming that *Minpeco's* approach is correct, the common-law fraud claims are still infirm. As explained above, the only sustainable market manipulation claim for the period February 1996 until the date of the complaint was against the Apollo Defendants. Scrutiny of the rest of the complaint that is time-barred under the federal securities laws yields no other action that satisfies the elements of a market manipulation claim. Plaintiffs repeatedly assert Defendants' responsibility for actions Baron's actions, do not specify who committed which acts, and assert fraud merely based on Defendants' profits from their investments with Baron. Thus, only the claims against the Apollo Defendants might survive with the help of the *Minpeco* rationale.

But the presence of market manipulation does not absolve Plaintiffs from satisfying the other elements of New York fraud. Judge Sweet in *Blech II* relied on *Minpeco* in determining that market manipulation could form the basis for a common-law fraud claim. *See* 961 F.Supp. at 587. However, he also held that plaintiffs had to plead reliance on the market. *See id.* The transactions for which the Apollo Defendants are allegedly liable were all unauthorized. It is not possible for Plaintiffs to have relied on the integrity of the market in making a decision to purchase securities when they never made such a decision. Thus, unlike a federal securities claim, Plaintiffs cannot assert common-law fraud based on unauthorized transactions. The common-law fraud claims are therefore dismissed for failure to state a claim.

### F. Leave to Replead

Plaintiffs argue that they should be permitted leave to replead any claims which have been dismissed. The general rule is that leave to replead should be granted when a complaint is dismissed. *In re Initial Public Offering Securities Litig.*, 241 F.Supp.2d at 397. However, repleading should not be granted when a claim is dismissed under Rule 12(b)(6) because such repleading would be futile. *See Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir.2002). Thus, Plaintiffs will not be granted leave to replead on causes of action dismissed for failure to state a claim. They will, however, be granted leave to replead when the Court has dismissed for failure to plead with sufficiently particularity.

### III. CONCLUSION

The Court summarizes its holdings here:

(1) The first, second, and third causes of action based on primary violations of the securities laws as they relate to Plaintiffs Fezzani, Cirenaca, Jane Bailey, the Blanks, Baydel, Bootlesville, and Cung are dismissed against all Defendants except Arthur Bressman (who has not appeared in this action) because they are time-barred;

(2) James Bailey's and the Burgesses' first three causes of action against the Bear Stearns Defendants are dismissed for failure to state a claim;

(3) James Bailey's and the Burgesses' second cause of action as to all Defendants is dismissed for failure to state a claim;

(4) James Bailey's and the Burgesses' first cause of action against the Individual and Broker Defendants is dismissed for failure to state a claim;

(5) James Bailey's and the Burgesses' third cause of action against the Broker Defendants is dismissed with leave to re-

plead for failure to plead with particularity;

(6) James Bailey's third cause of action against the Individual Defendants is dismissed for failure to state a claim;

(7) The Burgesses' third cause of action against the Individual Defendants is dismissed with leave to replead for failure to plead with particularity;

(8) James Bailey's and the Burgesses' first cause of action is dismissed against the Apollo Defendants for failure to state a claim;

(9) The control person liability claims against Bear Stearns are dismissed as untimely; all other control person claims are dismissed for failure to state a claim;

(10) All claims against Bank Audi are dismissed for improper service of process;

(11) All claims for aiding and abetting breach of fiduciary duty are dismissed for failure to state a claim, except for those of James Bailey against the Apollo Defendants; and

(12) All claims for common-law fraud are dismissed for failure to state a claim.

The effect of this decision is to leave the following claims intact: the RICO claims against the Baron Defendants, the federal securities fraud claims against Arthur Bressman, James Bailey's third cause of action based on market manipulation against the Apollo Defendants, and his aiding and abetting breach of fiduciary duty claim against the Apollo Defendants. Finally, Remaining Plaintiffs have sixty days from the date this decision is entered to replead their third cause of action against the Broker Defendants; the Burgesses also have sixty days to replead their third cause of action against the Individual Defendants.